# Exhibit A

Case #2023CV0113

| | |
|---|---|
| **Case Number** | 2023CV0113 |
| **Commencement Date** | 7/12/2023 1:13:18 PM |
| **Last Filing Date** | 8/15/2023 |
| **Days Open** | 40 |
| **Case Type** | COMPLAINT IN CIVIL ACTION FILED, W/ NOTICE TO PLEAD |
| **PFA Number** | |
| **Caption Plaintiff** | THE GUTHRIE CLINIC |
| **Caption Defendant** | CONVERGENCE CT |
| **Judgment Indicator** | No |
| **Lis Pendens Indicator** | No |
| **Judge** | EVAN WILLIAMS III |
| **Parcel Number** | |
| **Remarks** | |
| **Sealed** | No |

## Plaintiffs

| Name | Address | Country | Counsel | Notify | Sequence | Status |
|---|---|---|---|---|---|---|
| THE GUTHRIE CLINIC (GUTHRIE CLINIC) | ONE GUTHRIE SQUARE SAYRE, PA 18840 UNITED STATES | US | BUDMAN, JAN L, II | Yes | P1 | |

## Defendants

| Name | Address | Country | Counsel | Notify | Sequence | Status |
|---|---|---|---|---|---|---|
| CONVERGENCE CT | 735 BISHOP ST STE 323 HONOLULU, HI 96813 UNITED STATES | US | | Yes | D1 | |

## Docket Entries

| Sequence | Filing Date | Docket Type | Docket Text | Sealed | Filing ID |
|---|---|---|---|---|---|
| 0 | 7/12/2023 1:13:18 PM | COMPLAINT IN CIVIL ACTION FILED, W/ NOTICE TO PLEAD | | No | 1509252 |
| 1 | 8/15/2023 3:13:28 PM | PROOF OF SERVICE FILED | | No | 1511293 |

Any issues with information found, please contact the following email address: bcproth@bradfordco.org

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ Bradford _____ **County**

| For Prothonotary Use Only: | |
|---|---|
| Docket No: 2023 CV0 113 | PAID 151.50 |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

Lead Plaintiff's Name:
The Guthrie Clinic

Lead Defendant's Name:
Convergence CT

**Are money damages requested?** ☒ Yes  ☐ No

Dollar Amount Requested:  ☐ within arbitration limits
(check one)  ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes  ☒ No

**Is this an *MDJ Appeal*?** ☐ Yes  ☒ No

Name of Plaintiff/Appellant's Attorney: Jan Budman, Esq.

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professio

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____
- ☒ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

## IN THE COURT OF COMMON PLEAS OF
## BRADFORD COUNTY, PENNSYLVANIA

THE GUTHRIE CLINIC,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　No. 2023 CV 0113
　　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　**COMPLAINT**
CONVERGENCE CT,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　**(CIVIL ACTION – LAW)**
　　　　　　Defendant.　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Filed on Behalf of:
　　　　　　　　　　　　　　　　　　)　　The Guthrie Clinic, Plaintiff
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Counsel of Record for
　　　　　　　　　　　　　　　　　　)　　this Party:
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Jan L. Budman, Esquire
　　　　　　　　　　　　　　　　　　)　　Pa. I.D. No. 203200
　　　　　　　　　　　　　　　　　　)　　Stephanie N. Patton, Esquire
　　　　　　　　　　　　　　　　　　)　　Pa. I.D. No. 330201
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　BUCHANAN INGERSOLL & ROONEY
　　　　　　　　　　　　　　　　　　)　　PC
　　　　　　　　　　　　　　　　　　)　　Firm I.D. #038
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　409 North Second Street, Suite 500
　　　　　　　　　　　　　　　　　　)　　Harrisburg, Pennsylvania 17101
　　　　　　　　　　　　　　　　　　)　　Telephone: (717) 237-4800
　　　　　　　　　　　　　　　　　　)　　Facsimile: (717) 233-0852
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　**JURY TRIAL DEMANDED**

**IN THE COURT OF COMMON PLEAS OF**
**BRADFORD COUNTY, PENNSYLVANIA**

| | |
|---|---|
| THE GUTHRIE CLINIC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) No. 2023CV0113 |
| vs. | ) |
| | ) |
| CONVERGENCE CT, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

PROTHONOTARY
Bradford County Courthouse
301 Main Street
Towanda, PA 18848
(570) 265-1705

**IN THE COURT OF COMMON PLEAS OF**
**BRADFORD COUNTY, PENNSYLVANIA**

THE GUTHRIE CLINIC,                    )
                                       )
            Plaintiff,                 )
                                       )
    vs.                                )        No. 2023CV0113
                                       )
CONVERGENCE CT,                        )
                                       )
            Defendant.                 )
                                       )
                                       )
                                       )

## COMPLAINT

Plaintiff, The Guthrie Clinic ("Guthrie"), by and through its undersigned counsel, Buchanan Ingersoll & Rooney PC, hereby files this Complaint against Defendant, Convergence CT ("CCT"), averring as follows:

## PARTIES

1.    Guthrie is a Pennsylvania non-profit healthcare corporation with its principal place of business at One Guthrie Square, Sayre, Pennsylvania 18840.

2.    CCT is a Delaware corporation with a principal place of business at 735 Bishop Street, Suite 323, Honolulu, Hawaii 96813.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 42 Pa. C.S.A. § 931, § 5301(a)(2)(ii) because CCT contractually agreed to litigation in this Court, and § 5322(a)(1) because CCT committed acts for pecuniary gain in the Commonwealth of Pennsylvania and contracted to provide services in the Commonwealth.

3

4.      Venue is proper in this Court because the agreement at issue provides for the same and because the cause of action arose in, and transactions and occurrences out of which this cause of action arose occurred in Bradford County, Pennsylvania.

## FACTUAL ALLEGATIONS

5.      Guthrie is a non-profit, multi-specialty group healthcare practice that was founded in 1910.

6.      Guthrie centers its reputation on its commitment to its core values of patient centeredness, teamwork and excellence, as well as a focus on academics in medicine.

7.      Guthrie has 32 regional offices, a relationship with Robert Packer Hospital, four of its own hospitals, more than 365 primary and specialty care physicians and 300 advance practice practitioners, and more than one million patient visits each year in 22 communities in Pennsylvania and New York.

8.      In the course of providing its core healthcare services to patients, Guthrie receives and utilizes confidential patient health and financial information.

9.      At all times relevant, Guthrie sought to have access to its confidential patient health and financial information in a more usable format that would allow Guthrie to analyze the data for research and operational purposes.

10.     CCT markets itself as being in the business of developing and marketing highly secure patient data warehouse products, query tools, and patient data research analytics for the pharmaceutical, biotechnology, and healthcare industries.

11.     CCT induced Guthrie to enter into a contract whereby CCT promised to provide a multi-participant, multi-national healthcare data network for Guthrie's research and analytical use in exchange for certain refundable payments and the provision of Guthrie's confidential and

proprietary patient and financial information for the limited purposes set forth in the contract only.

**A.     *The Agreement***

12.     On August 30, 2018, Guthrie entered into a contract (the "Agreement") with CCT whereby Guthrie would participate in CCT's Global Healthcare Data Network ("GHDN") in exchange for certain payments and the provision of Guthrie's data to CCT for the limited purposes specified in the Agreement only.  A copy of the Agreement is attached as **Exhibit A**.

13.     The GHDN is defined in the Agreement as a "multi-participant, multi-national, healthcare data network designed, developed and operated by CCT for providing rapid and cost-effective real-world clinical data exploration and analysis of Fully De-Identified Data across multiple healthcare practices, hospitals and health systems through a secure, Federated Query system" which "leverages CCT's Connected Technologies Platform." Exh. A at § 1(a)(xi).

14.     CCT's Connected Technologies Platform, in turn, is defined as "CCT's proprietary hardware/software system and processes . . . for the collection, management, validation, normalization and de-identification of patient data to enable exploration and analysis of comprehensive, longitudinal data." *Id.* at § 1(a)(iii).

15.     CCT promised that it would provide access to and participation in the GHDN through CCT's GHDN Staging System. *Id.* at § 3(e)(ii).

16.     The GHDN Staging System, in turn, is defined as "a standardized package of hardware, software . . . , help desk support, and training [which leverages CCT's Connected Technologies Platform] to be provided to [Guthrie] for the purpose of extracting and consolidating data from [Guthrie's] electronic medical records and other clinical and healthcare information systems, the removal of identifiers to create Limited Data Set Data, De-Identified

Data or Fully De-Identified Data, and for patient linking to create longitudinal records." *Id.* at §
1(a)(xiii).

17.     At all times relevant, therefore, it was CCT's responsibility to collect, manage,
validate, normalize, and de-identify Guthrie's patient data for exploration and analysis in the
GHDN that CCT designed, developed and operated. *See id.* at § 1(a)(iii), (xi).

18.     Likewise, it was CCT's responsibility to extract, consolidate, and otherwise
normalize data from Guthrie's medical records and information systems through the GHDN
Staging System. *See id.* at § 1(a)(xiii).

19.     Guthrie agreed only "to become a *participant* in CCT's" GHDN. *Id.* at § 3(a)
(emphasis added).

20.     On the other hand, CCT at all times was "responsible for the organization,
management and operation of the GHDN." *Id.* at § 3(e)(i).

21.     Although defined by the Agreement as a "multi-national" network, upon
information and belief, Guthrie (based in the United States) was CCT's only GHDN user.

22.     Access to the GHDN was the basis for the Agreement, as both parties agreed that
CCT "has established" the GHDN and Guthrie "desire[d] to join the GHDN" and "improve and
expand its access to internal and external clinical data[.]" *Id.* at Preamble.

23.     CCT marketed and represented the GHDN to Guthrie as a patient data analytics
tool that would include Guthrie's and other healthcare entities' patient data which, collectively,
could be accessed by users in redacted form for purposes of research and patient data analytics.

24.     Guthrie relied on CCT's express representation that the GHDN was already
"designed, developed and operated by CCT" for the purposes set forth in the Agreement. *See id.*
at § 1(a)(xi).

25.     However, as became clear throughout the term of the Agreement, CCT misrepresented the scope and capability of the GHDN.

**B.      *CCT's Failure to Provide Access to the GHDN, Guthrie's Own Data, and Other GHDN Participant Data***

26.     Pursuant to the Agreement, Guthrie was required to provide its Source Data to CCT, defined as "any and all source data provided to CCT by [Guthrie] from its information systems across the [Guthrie] organization, including without limitation clinical, administrative, operational and financial data and including any ancillary data that may be available through [Guthrie] external sources." Exh. A, at §§ 1(a)(xxiii); 3(b)(iii).

27.     CCT promised and was permitted to use Guthrie's Source Data solely for the limited purposes set forth in the Agreement—to wit, creating de-identified data for purposes of research and analysis in the GHDN by GHDN participants only, and only during the term of the Agreement. *See, e.g., id.* at §§ 6(a)(i), (d); 11(a).

28.     Guthrie provided its Source Data to CCT in accordance with the Agreement.

29.     CCT promised to thereafter perform de-identification of Guthrie's Source Data and at all times "map source data, normalize data, store data in a secure data warehouse and manage data validation, de-identification and longitudinal linkage" of Guthrie's data. *See id.* at § 1(a)(xiii); 5(a). Guthrie had the right to access and query its own de-identified data in the GHDN at no cost. *Id.* at §§ 3(b)(v); 6(b)(ii).

30.     Guthrie also had the right "to query the Fully De-Identified Data contributed by all other GHDN Participants, in the aggregate, through the Federated Query system that is

provided, controlled and monitored by CCT for the purposes set forth" in the Agreement.[1] *Id.* at § 6(b)(ii).

31.    At no time, however, did CCT provide Guthrie with the required access to the GHDN, to Guthrie's own data in a usable format, or to any GHDN participant data.

32.    Specifically, CCT refused to permit Guthrie to access any other GHDN participant data unless Guthrie could provide a specific research project.

33.    CCT was obligated to provide support and training to Guthrie for utilization of the GHDN and access to the de-identified data. *Id.* at §§ 3(e)(vi); 5(d).

34.    CCT refused and/or failed to provide such training to Guthrie.

35.    CCT promised to establish and "be responsible for the organization, management and operation of the GHDN." *Id.* at § 3(e)(i).

36.    However, the data Guthrie provided to CCT for the GHDN was missing, incorrect, or never put into a usable, de-identified format.

37.    Instead, documented requirements for infrastructure, integration, tools, and data were continuously changed by CCT and/or never completed.

38.    CCT never normalized the data Guthrie provided to it.

**C.    *CCT's Refusal to Remit the Payments Required by the Agreement***

39.    Guthrie was required to pay a one-time implementation fee of $350,000 "to cover the installation, initial setup activities and license to use the GHDN Staging System" (the "Implementation Fee"). *Id.* at § 3(d)(i).

---

[1] Federated Query is defined by the Agreement as "a query request distributed to databases of individual GHDN Staging Systems among [Guthrie] and other GHDN Participants, in the aggregate. Federated Queries eliminate the need for [Guthrie] Source Data and source data from other GHDN Participants to be exported into a centralized data repository outside the Firewall of their healthcare organization." Exh. A at § 1(a)(vii).

40.     Guthrie paid the Implementation Fee to CCT.

41.     Despite Guthrie's payment of the Implementation Fee, the GHDN Staging System was never set up in any working form by CCT for Guthrie to use or access.

42.     Guthrie has never accessed, used, or been able to use, the GHDN Staging System or the GHDN.

43.     It is therefore believed and averred that CCT has retained the Implementation Fee paid by Guthrie for purposes other than those provided for by the Agreement.

44.     Moreover, the Agreement expressly provides that Guthrie would completely recover the Implementation Fee paid to CCT in the form of five (5) yearly "Guaranteed Annual Minimum Payments" of $70,000 each over the Initial Term. *Id.* at §§ 3(b)(iii); 9(a).

45.     The Guaranteed Annual Minimum Payments were to be paid annually by CCT to Guthrie "at the end of each year following the Effective Date" except that for "contract year one (1) only," the Guaranteed Annual Minimum Payment was also conditioned "upon the mutual agreement on the Implementation Work Plan and the successful loading of [Guthrie's] Source Data in accordance with the Implementation Work Plan." *See id.*

46.     The Implementation Work Plan is described more specifically in Exhibit 4 to the Agreement, and includes thirteen phases which include, *inter alia*, a review of data extraction processes, identification of Guthrie data sources, extraction of current year and retrospective data, and deployment of Guthrie access to the GHDN. *Id.* at Exh. 4.

47.     It was CCT's responsibility to develop and establish the Implementation Work Plan; it was Guthrie's responsibility to assist CCT in development and establishment of the same. *See id.* at § 3(d)(iii), ("[Guthrie] will assist CCT, as reasonably requested by CCT in the

development of the Implementation Work Plan"); § 5(a) ("according to the mutually agreeable Implementation Work Plan established by CCT with input from [Guthrie] . . .").

48.    At all times relevant, Guthrie assisted CCT as requested and provided input regarding the Implementation Work Plan.

49.    Guthrie and CCT mutually agreed to the Implementation Work Plan as described in Exhibit 4 to the Agreement.

50.    Guthrie successfully loaded its Source Data in accordance with the Implementation Work Plan, including the required then-current year and retrospective data. *See id.* at § 1(a)(xxiii); Exh. 4.

51.    Although Guthrie performed its obligations under the Agreement with respect to the Implementation Work Plan and successfully loaded its Source Data, CCT refused and/or failed to pay Guthrie the Guaranteed Annual Minimum Payment at the end of the first year following the Effective Date as required by the Agreement.

52.    In addition, CCT has refused and/or failed to pay Guthrie the Guaranteed Annual Minimum Payments at the end of the second, third, fourth, and fifth years following the Effective Date.

53.    The Agreement also required CCT to pay Guthrie certain portions of the gross revenue received by CCT for each CCT client subscribing to the GHDN. *Id.* at § 3(b)(i).

54.    Specifically, CCT was required to pay 20% of its revenue obtained from GHDN clients (the "Revenue Sharing Pool") to GHDN participants, to be split as follows:

    a.    25% of the Revenue Sharing Pool was to be split between GHDN participants "based on the relative number of patients (as a percentage) included in the GHDN Participant's fully de-identified data set in the GHDN at the time of

the execution of the subscription agreement by each CCT Client." *Id.* at §
3(b)(i)(i).

b.     75% of the Revenue Sharing Pool was to be split "among the
corresponding subset of GHDN Participants, based on the relative number of
patient records (as a percentage) involved in the cumulative Federated Query
results by each CCT Client during its subscription period." *Id.* at § 3(b)(i)(ii).

55.     CCT provided no payments from the Revenue Sharing Pool to Guthrie.

56.     CCT was further required to provide Guthrie with annual statements of all
payments Guthrie received from its share of the Revenue Sharing Pool. *Id.* at § 3(b)(i)(iv).

57.     CCT never provided an annual statement to Guthrie.

58.     CCT also induced Guthrie to join the GHDN as an "Early Adopter."

59.     "Early Adopter" is defined by the Agreement as "a GHDN Participant who has
chosen to join the GHDN at an early stage in order to receive participation benefits in addition to
those benefits and opportunities provided to other GHDN Participants, including additional
revenue sharing opportunities available only to Early Adopters." *Id.* at § 1(a)(iv).

60.     The Agreement provides that only five (5) participants would be selected by CCT
as Early Adopters. *Id.*

61.     Under the terms of the Agreement, Early Adopters were to receive 10% of the
gross revenues received from each CCT client for subscription to the GHDN (the "Early Adopter
Bonus"). *Id.* at § 3(b)(i)(ii).

62.     The Early Adopter Bonus is in addition to the Guaranteed Annual Minimum
Payments. *Id.*

11

63.     CCT never paid Guthrie any portion of the Early Adopter Bonus that it owed Guthrie.

64.     To date, CCT has paid Guthrie none of the payments it promised to pay pursuant to the Agreement.

**D.     CCT's Unlawful Retention of Guthrie's Source Data and Confidential Information**

65.     CCT promised to "map source data, normalize data, store data in a secure data warehouse and manage data validation, de-identification and longitudinal linkage at all times in compliance with applicable federal and state law and regulations, including, but not limited to the Privacy Laws, as well as the Business Associate Agreement" attached to the Agreement as Exhibit 6. *Id.* at § 5(a).

66.     CCT also promised that it would not retain any copies of Guthrie's fully de-identified data "after the completion of the Federated Query and analysis session." *Id.* at § 5(b).

67.     Guthrie granted CCT a non-exclusive, non-transferrable license to use Guthrie's Source Data "solely for the purpose of creating longitudinal De-Identified Data and Fully De-Identified Data" and only for the term of the Agreement. *Id.* at § 6(a)(i).

68.     Guthrie's Source Data was "for use by CCT only as specifically set forth in" the Agreement, and CCT was not permitted to "cause or permit others to copy, duplicate, redistribute, retransmit, publish, assign, sell, license or sublicense or otherwise transfer" Guthrie's fully de-identified data. *Id.* at § 6(d).

69.     CCT understood its obligations to maintain Guthrie's Source Data in a secure manner. *See id.* at § 7.

70.     CCT further agreed that it would protect "any information" disclosed by Guthrie under the Agreement, including specifically "[a]ll data and health information provided by" Guthrie to CCT. *Id.* at § 11.

71.    CCT is expressly prohibited by the Agreement from making "any use whatsoever at any time of" Guthrie's data and health information "except as expressly authorized" by the Agreement. *Id.* at § 11(a).

72.    Moreover, CCT agreed "not [to] use or disclose [Protected Health Information] except as required to satisfy its obligations to [Guthrie] under the GHDN Agreement, as permitted by [the Business Associate Agreement], or as required by law. *Id.* at Exh. B, § 2.1.

73.    CCT expressly "acknowledge[d] that . . . all [Protected Health Information] shall be and remain the sole property of" Guthrie. *Id.*

74.    Upon information and belief, CCT has used and is using Guthrie's Source Data for purposes other than those permitted by the Agreement.

75.    Upon information and belief, CCT continues to retain Guthrie's Source Data in violation of the Agreement and applicable federal and state laws.

**E.    *Other Breaches by CCT***

76.    The Agreement requires CCT to "deliver all services at a level that assures [Guthrie] a high level of service quality, accuracy and access to all system functionality, reasonably consistent with the level of service maintained by leading on-line service providers to the health care industry." *Id.* at § 3(e)(viii).

77.    CCT never provided Guthrie with usable access to the GHDN.

78.    After Guthrie provided and successfully loaded its Source Data to CCT, the data was continually inaccurate when transposed by CCT.

79.    Likewise, CCT continuously failed to de-identify and/or normalize the Source Data Guthrie provided.

80.    CCT initially represented that it had familiarity with Guthrie's data system, Epic.

81.    However, CCT subsequently informed Guthrie that it was unable to process the data Guthrie successfully loaded.

82.    In response to Guthrie's concerns about the same, CCT reversed its initial representation and later admitted that CCT had a lack of familiarity and experience with the Epic data model and data definitions.

83.    CCT's representations regarding its familiarity with Epic, therefore, were contradictory, misleading, and deceptive.

84.    The Agreement requires CCT to "organize and manage the activities of a GHDN Advisory Board among" Guthrie and the other GHDN participants. *Id.* at § 3(e)(vii).

85.    Guthrie was to serve as a member of the GHDN Advisory Board. *Id.* at § 3(d)(vi).

86.    CCT never established a GHDN Advisory Board.

87.    CCT failed and/or refused to provide Guthrie with copies of the "Revenue Share Audits" that CCT was required to provide to Guthrie "on an annual basis." *Id.* at § 13(e).

88.    CCT was required to "provide all services in compliance with its representations set forth in the Guthrie Clinic IT Vendor Risk Assessment dated July 31, 2018[.]" *Id.* at § 3(e)(ix).

89.    Among other things, the IT Vendor Risk Assessment required CCT to "implement a fully de-identified, research staging system behind Guthrie's firewall within Guthrie's policies and procedures (at the preference of Guthrie, either on premise or in a virtual private cloud)." A copy of the IT Vendor Risk Assessment is attached as **Exhibit B**.

90.    Likewise, CCT agreed to "map source data, normalize data, store data in a secure data warehouse and manage data validation, de-identification and longitudinal linkage at all times in compliance with applicable law and the Privacy Laws." *See* Exh. B.

91.    CCT represented that it "has a proprietary software application that ingests . . . raw data feeds from sources, strips ePHI from records and replaces ePHI, where appropriate, before loading those data into the fully de-identified staging system." *Id.*

92.    Despite these representations and promises by CCT, it failed to normalize Guthrie's data, manage data validation, or de-identify data accurately.

93.    Additionally, CCT failed to implement a fully de-identified, research staging system.

### F.    *Termination of the Agreement*

94.    On several occasions, Guthrie communicated its concerns to CCT regarding CCT's breaches and deficient performance of the terms of the Agreement.

95.    CCT failed to correct its material breaches or deficient performance.

96.    At all times, CCT failed to perform the material terms of the Agreement.

97.    Guthrie continued in good faith to attempt to resolve CCT's material breaches and deficient performance for several years, at all times performing its obligations under the Agreement.

98.    Because of CCT's refusal to correct its material breaches or deficient performance and its continuous failure to meet its material obligations under the Agreement, Guthrie was forced to provide notice of non-renewal and termination of the Agreement to CCT.

99.    Guthrie provided its final notice of non-renewal and termination on September 23, 2022.

100. Upon termination, CCT was required to destroy or eliminate access to all of Guthrie's Source Data. Exh. A at § 9(d).

101. Moreover, "immediately upon termination" of the Agreement, CCT was required to return or destroy and certify the destruction of all of Guthrie's confidential information, including all of Guthrie's "data and health information" provided to CCT and any copies thereof. *Id.* at § 11(c).

102. CCT refuses to provide proof that it has destroyed and/or eliminated access to Guthrie's Source Data.

103. CCT has not returned Guthrie's Source Data or confidential information to Guthrie.

## COUNT I
## BREACH OF CONTRACT

104. Guthrie realleges and incorporates by reference the allegations contained in Paragraphs 1 through 103 above.

105. Guthrie and CCT entered into the Agreement whereby, *inter alia*, Guthrie would participate in CCT's GHDN in exchange for Guthrie's payment to CCT of the Implementation Fee and the provision of Guthrie's Source Data to CCT for the purposes set forth in the Agreement only. *See* Exh. A.

106. Guthrie paid the Implementation Fee and provided its Source Data to CCT, and at all times performed its obligations under the Agreement.

107. The Agreement required CCT, *inter alia*, to transpose Guthrie's data into a usable, de-identified format, provide Guthrie with training, establish a GHDN Advisory Board, provide certain revenue statements, comply with the IT Vendor Risk Assessment, and provide

Guaranteed Annual Minimum Payments, revenue sharing payments, and Early Adopter bonus payments. *See* Exh. A.

108.    CCT materially breached the Agreement by failing to perform each and every one of its foregoing obligations.

109.    Critically, despite Guthrie's successful provision and loading of its Source Data to CCT, CCT never (1) normalized Guthrie's data into a usable, fully de-identified format, (2) provided Guthrie access to its own or other GHDN participant data in the GHDN, or (3) remitted a single payment to Guthrie.

110.    CCT's material breaches have caused Guthrie to suffer damages that Guthrie is entitled to recover.

111.    Moreover, Pennsylvania law provides that every contract carries with it an implied covenant of good faith and fair dealing.

112.    CCT's complete refusal to cooperate with Guthrie, perform its obligations pursuant to the Agreement, or correct its material breaches and deficient performance is a breach of the implied covenant of good faith and fair dealing.

**WHEREFORE**, Guthrie respectfully requests judgment in its favor and against CCT, plus pre- and post-judgment interest, costs, attorneys' fees, and any other relief the Court deems just and proper, which amount exceeds the limits for compulsory arbitration.

## COUNT II
### MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO PENNSYLVANIA'S UNIFORM TRADE SECRETS ACT

113.    Guthrie realleges and incorporates the allegations contained in Paragraphs 1 through 112 above.

114.    Guthrie, through its experience, expertise, and substantial investment of time, money, and resources, has developed confidential, proprietary, and trade secret information that

belongs to Guthrie for its sole use and benefit, including but not limited to the confidential patient Source Data provided to CCT, which further includes Guthrie's confidential patient lists, patient diagnosis and treatment information, and financial data.

115.    Such information constitutes "trade secrets" within the meaning of the Pennsylvania Uniform Trade Secrets Act ("PAUTSA"), as it: (1) derives independent economic value from not generally being known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure; and (2) is the subject of efforts to maintain its secrecy. *See* 12 Pa. C.S.A. § 5302.

116.    Guthrie makes reasonable efforts to safeguard and maintain its trade secrets, preventing disclosure by limiting distribution of this information only to necessary employees on a need-to-know basis and by requiring such employees to commit to maintaining the confidentiality of the information.

117.    Guthrie has a legitimate, protectable interest in its confidential and trade secret information.

118.    By virtue of the Agreement, CCT owed a legal duty to Guthrie not to use, disclose, or otherwise misappropriate such confidential, proprietary, and trade secret information, which CCT would not have otherwise obtained but for the Agreement. *See* Exh. A at §§ 5(b); 6(a)-(d); 7; 9(d); 11.

119.    CCT expressly acknowledged and agreed "that due to the unique nature of the Confidential Information, there can be no adequate remedy at law for any breach of the obligations [under the Agreement], that any such breach will allow [CCT] to unfairly compete with [Guthrie] and will result in irreparable harm to [Guthrie] and therefore that upon any such breach or any threat thereof, [Guthrie] shall be entitled to appropriate equitable relief, including,

without limitation, a cease and desist order, temporary restraining order, preliminary and permanent injunctive relief, in addition to whatever remedies [Guthrie] might have at law under" the Agreement. *Id.* at § 11(e).

120. It is believed, and therefore averred, that CCT misappropriated, used, and/or disclosed, or will inevitably use or disclose Guthrie's trade secrets.

121. At the time of misappropriation, disclosure, and/or use, CCT knew or had reason to know that its knowledge of Guthrie's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy.

122. CCT's conduct constitutes a breach of its legal duty not to misappropriate Guthrie's confidential trade secret information.

123. It is believed, and therefore averred, that CCT obtained Guthrie's trade secrets through improper means by inducing Guthrie to enter into the Agreement based on CCT's misrepresentations as to CCT's capabilities, the capability and reach of the GHDN, and CCT's purposes for both the Agreement and the GHDN.

124. CCT misappropriated Guthrie's trade secrets, including but not limited to Guthrie's confidential patient Source Data, which further includes Guthrie's confidential patient lists, patient diagnosis and treatment information, and financial data.

125. It is believed, and therefore averred, that CCT utilized Guthrie's trade secrets to develop its commercial patient and healthcare analytics software for the competitive benefit solely of CCT.

126. At all times, CCT acted willfully and maliciously, intentionally taking Guthrie's trade secrets with a reckless indifference to Guthrie's interests in the same.

127.    CCT's use of Guthrie's confidential and trade secret information has resulted in irreparable injury to Guthrie.

128.    As a result of CCT's misappropriation of Guthrie's trade secrets, Guthrie will continue to suffer unquantifiable damages and will lose the value of its Source Data, including its confidential patient lists, patient diagnosis and treatment information, and financial data.

129.    Because it would be impossible to determine or ascertain the economic value of harm to Guthrie caused by CCT's misappropriation of Guthrie's trade secrets, Guthrie has no adequate remedy at law.

130.    Guthrie has a clear legal right to a preliminary and permanent injunction and is likely to succeed on the merits in obtaining a favorable judgment against CCT.

131.    Pursuant to 12 Pa. C.S.A. § 5305, the Court may award attorneys' fees to Guthrie based on CCT's willful and malicious misappropriation of Guthrie's trade secrets.

**WHEREFORE**, Guthrie respectfully requests that this Court:

(a) Enter its judgment preliminarily, and upon final hearing, permanently restraining CCT and its affiliates, subsidiaries, officers, directors, agents, servants, employees, representatives, privies, successors, assigns, and all of those acting for CCT, or any of them, or on their behalf, or acting in concert with CCT, directly or indirectly, from using, developing, disclosing, offering for sale, or selling at any time any and all confidential information, belonging to or provided by Guthrie to CCT, including its confidential patient Source Data, patient lists, patient diagnosis and treatment information, and financial information;

(b) Award compensatory damages proximately resulting from CCT's misappropriation, use, and/or disclosure of Guthrie's confidential and trade secret information, which amount exceeds the limits for compulsory arbitration;

(c) Award exemplary damages in an amount equal to two times the amount of damages awarded in (b) for CCT's willful and malicious misappropriation of CCT's confidential and trade secret information;

(d) Award reasonable attorneys' fees, costs, and expenses; and

(e) Award such other monetary and equitable relief as is just and proper.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO
## THE FEDERAL DEFEND TRADE SECRETS ACT

132.    Guthrie realleges and incorporates the allegations contained in Paragraphs 1 through 131 above.

133.    The federal Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *See* 18 U.S.C. § 1832 *et seq.*

134.    "Trade secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic or engineering information" that derive independent economic value from not being generally known or readily accessible by the public using proper means and which the owner has taken reasonable steps to protect.  18 U.S.C. § 1839(3).

135.    By virtue of the Agreement, CCT obtained access to and control of Guthrie's trade secrets, which includes but is not limited to Guthrie's confidential patient Source Data, which further includes confidential patient lists, patient diagnosis and treatment information, and financial information.

136.    It is believed, and therefore averred, that CCT has used and misappropriated this information and shared it amongst itself and with others to gain competitive advantage in its business of developing and marketing highly secure patient data warehouse products, query

tools, and patient data research analytics for the pharmaceutical, biotechnology, and healthcare industries.

137.    This information relates directly to Guthrie's presence and use of the same in interstate commerce, illustrated by Guthrie's presence in both Pennsylvania and New York, as well as its presence in the medical academic community throughout the United States.

138.    This trade secret information: (1) is not known outside Guthrie; (2) is known only to appropriate Guthrie's employees on a need-to-know basis; (3) is subject to reasonable measures to guard the secrecy of the information; (4) is valuable; and (5) is impossible or difficult for others to properly acquire or duplicate independently.

139.    CCT knew it had a duty pursuant to the Agreement to maintain the secrecy of Guthrie's confidential information and trade secrets, to use the same solely for purposes of the GHDN, not to retain any of Guthrie's de-identified data "after the completion of the Federated Query and analysis session." *See* Exh. A, at §§ 5(b); 6(a)-(d); 7; 11.

140.    CCT also knew that it was required to return, destroy or eliminate access to all of Guthrie's data upon termination of the Agreement. *Id.* at §§ 9(d); 11(c).

141.    Upon information and belief, CCT has used and continues to use Guthrie's trade secrets without Guthrie's consent or authorization to benefit CCT in a manner that has caused and will cause Guthrie irreparable harm.

142.    CCT's actions constitute actual and continuing misappropriation in violation of the DTSA.

143.    Guthrie has suffered damages and irreparable harm as a result of CCT's violations of the DTSA.

**WHEREFORE**, Guthrie respectfully requests that this Court:

(a) Enter its judgment preliminarily, and upon final hearing, permanently restraining CCT and its affiliates, subsidiaries, officers, directors, agents, servants, employees, representatives, privies, successors, assigns, and all of those acting for CCT, or any of them, or on their behalf, or acting in concert with CCT, directly or indirectly, from using, developing, disclosing, offering for sale, or selling at any time any and all confidential information, belonging to or provided by Guthrie to CCT, including its confidential patient Source Data, patient lists, patient diagnosis and treatment information, and financial information;

(b) Award compensatory damages proximately resulting from CCT's misappropriation, use, and/or disclosure of Guthrie's confidential and trade secret information, which amount exceeds the limits for compulsory arbitration;

(c) Award exemplary damages in an amount equal to two times the amount of damages awarded in (b) for CCT's willful and malicious misappropriation of CCT's confidential and trade secret information;

(d) Award reasonable attorneys' fees; and

(e) Award costs of suit and such other monetary and equitable relief as is just and proper.

## COUNT IV
## UNJUST ENRICHMENT

144.    Guthrie realleges and incorporates the allegations contained in Paragraphs 1 through 143 above.

145.    As noted throughout this Complaint, Guthrie provided its highly confidential patient Source Data to CCT.

146.    CCT has retained Guthrie's Source Data despite providing no benefit to Guthrie in exchange for the same.

147.    CCT's access to and retainage of Guthrie's Source Data has allowed and continues to allow CCT to utilize Guthrie's Source Data to develop and improve CCT's own business.

148.    Specifically, CCT used its relationship with Guthrie to obtain Guthrie's Source Data to advance CCT's own business purposes unrelated to its contractual relationship with Guthrie.

149.    Upon information and belief, CCT has used and is using Guthrie's confidential patient Source Data for research and development of its own software provision capabilities and products.

150.    CCT's wrongful conduct renders CCT's use, at all times, and retention of Guthrie's Source Data inequitable unless CCT pays Guthrie for the value of the benefits it has received.

151.    By CCT's misappropriation of Guthrie's confidential patient Source Data, CCT has been unjustly enriched.

152.    As a direct and proximate result of the CCT's actions, Guthrie has been damaged.

**WHEREFORE**, Guthrie respectfully requests judgment in its favor and against CCT, awarding it damages—including compensatory, consequential, incidental and special damages—and pre- and post-judgment interest resulting from CCT's actions, and awarding Guthrie its costs incurred in prosecuting this action, which amount exceeds the limits for compulsory arbitration.

**COUNT V**
**CONVERSION**

153.    Guthrie realleges and incorporates the allegations contained in Paragraphs 1 through 152 above.

154.    Guthrie is the proper owner of its confidential, proprietary, and/or trade secret information, including but not limited to any and all data provided to CCT pursuant to the Agreement.

155.    CCT has wrongfully retained and continues to wrongfully retain Guthrie's confidential, proprietary, and/or trade secret information.

156.    Upon information and belief, CCT has utilized Guthrie's confidential, proprietary, and/or trade secret information for purposes outside the scope of the Agreement.

157.    Through CCT's actions, it has unlawfully deprived Guthrie of its property rights in its confidential, proprietary, and/or trade secret information without Guthrie's consent and without lawful justification.

158.    CCT has acted in bad faith by wrongfully retaining Guthrie's confidential and proprietary information.

159.    CCT's actions have interfered and continue to interfere with Guthrie's right of control of its property.

160.    This unlawful conduct has resulted in significant inconvenience and expense to Guthrie, which has had to retain counsel and incur legal fees in its efforts to secure the return of its property.

161.    CCT's wrongful conduct has therefore so seriously interfered with Guthrie's right to possession of its property as to justify requiring CCT to fully compensate Guthrie for its value.

**WHEREFORE**, Guthrie respectfully requests injunctive relief as set forth more fully in Counts II and III above, as well as an award of compensatory damages, punitive damages, attorneys' fees, and any other relief this Court deems just and proper, which amount exceeds the limits for compulsory arbitration.

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

_____

Jan L. Budman II, Esq.
Pa. I.D. No. 203200
Stephanie N. Patton, Esq.
Pa. I.D. No. 330201
Buchanan Ingersoll & Rooney PC
409 North Second Street, Suite 500
Harrisburg, Pennsylvania 17101
Telephone: (717) 237-4800
Facsimile: (717) 233-0852
jan.budman@bipc.com
stephanie.patton@bipc.com

*Attorneys for Plaintiff The Guthrie Clinic*

DATED: July 11, 2023

**VERIFICATION**

I, Dr. Frederick J. Bloom, Chief Population Health Officer of The Guthrie Clinic, verify that the facts contained in the foregoing Complaint are true and correct, to the best of my knowledge, information and belief.

I understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. Section 4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false averments I may be subject to criminal penalty.

Dated: **07/10/2023**                           Dr. Frederick J. Bloom

27

## **CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Jan L. Budman II, Esq.

Signature: _____

Attorney No.: 203200

28

# Exhibit A



**GLOBAL HEALTHCARE DATA NETWORK[TM]**

**PARTICIPATION A GREEMENT**

Between

CONVERGENCE CT, INC.

and

THE GUTHRIE CLINIC

August 30, 2018

1

**THIS GLOBAL HEALTHCARE DATA NETWORK™ PARTICIPATION AGREEMENT** (the "GHDN Agreement"), is made and entered into as of the 30th day of August, 2018, (the "Effective Date"), by and between THE GUTHRIE CLINIC ("PARTICIPANT"), a 503(c) corporation having a principal place of business at One Guthrie Square, Sayre, PA 18840, and CONVERGENCE CT ("CCT"), a Delaware corporation having its principal place of business at 735 Bishop Street, Suite 323, Honolulu, Hawaii 96813, USA.

WITNESSETH:

**WHEREAS**, CCT is in the business of providing a combination of products and services to support the secure collection, management and use of comprehensive healthcare data in support of patient data analysis, care delivery operations, quality and performance improvement, operational research and medical research to clients throughout the healthcare delivery, medical products, life sciences and health insurance industries;

**WHEREAS**, CCT has established a multi-participant, multi-national, healthcare data network, referred to and further described herein as the Global Healthcare Data Network (the "GHDN");

**WHEREAS**, PARTICIPANT is a health care delivery system that provides medical, healthcare and research services;

**WHEREAS**, PARTICIPANT desires to improve and expand its access to internal and external clinical data and related health/healthcare information in order to further advance its operational and improvement research, medical research, clinical research, health services research and medical education/accreditation activities;

**WHEREAS**, PARTICIPANT desires to establish new research, improvement and data-driven revenue opportunities in a number of areas; and

**WHEREAS**, PARTICIPANT desires to join the GHDN as a contributing participant and an Early Adopter under the terms of this GHDN Agreement;

**NOW THEREFORE**, in consideration of the mutual promises and obligations contained herein, and for other good and valuable consideration, the receipt, adequacy, and sufficiency of which is hereby expressly acknowledged, PARTICIPANT and CCT (collectively, the "Parties") hereto mutually agree as follows:

1. **DEFINITIONS.**
   a) <u>Defined Terms</u>. As used in this GHDN Agreement, the following terms shall have the following meanings as set forth below or as otherwise indicated in other sections of this GHDN Agreement:
      i) "<u>CCT Client</u>" means a Third Party, including but not limited to life science, medical device, health information technology and health insurance companies, that has

2

executed an agreement with CCT and has paid a subscription fee for the analysis of Fully De-Identified Data licensed from PARTICIPANT and other GHDN Participants, in the aggregate, through Federated Queries of the GHDN. Such CCT Client agreements shall have the same or greater level of compliance and restrictions on use of GHDN PARTICIPANT Data as CCT has for its use of PARTICIPANT Data (as described below) under the terms of this GHDN Agreement.

ii) "Cloud Licenses" means software or services made available to users on demand via the Internet from a cloud computing provider's server as opposed to being provided from a company's own on-premises servers.

iii) "Connected Technologies™ Platform" means CCT's proprietary hardware/software system and processes, applied on-premise or in the cloud, for the collection, management, validation, normalization and de-identification of patient data to enable exploration and analysis of comprehensive, longitudinal data. The features and general specifications of the Connected Technologies Platform are summarized in Exhibit 2.

iv) "Early Adopter" means a GHDN Participant who has chosen to join the GHDN at an early stage in order to receive participation benefits in addition to those benefits and opportunities provided to other GHDN Participants, including additional revenue sharing opportunities available only to Early Adopters. Only five (5) GHDN Participants will be selected by CCT for Early Adopter status.

v) "Early Adopter Revenue Sharing Pool" is defined in Section 3 b) ii).

vi) "Exhibit" shall mean any document so designated which is affixed to this GHDN Agreement and incorporated herein. A list of Exhibits affixed hereto is included below in Section 2.

vii) "Federated Query" means a query request distributed to databases of individual GHDN Staging Systems (as defined below) among PARTICIPANT and other GHDN Participants, in the aggregate. Federated Queries eliminate the need for PARTICIPANT Source Data and source data from other GHDN Participants to be exported into a centralized data repository outside the Firewall of their healthcare organization.

viii) "Firewall" shall mean a network security system that monitors and controls the incoming and outgoing network traffic based on pre-determined security rules.

ix) "De-Identified Data" means health information derived from PARTICIPANT Limited Data Set Data which has all the direct and indirect patient individual identifiers removed or obfuscated in accordance with the HIPAA regulations in force at any point in time. De-Identified Data shall meet the standard and implementation specifications for de-identification under 45 CFR 164.514 (a) and (b) and is considered not to be individual identifiable health information pursuant to 45 CFR 164.514 and not to be individual identifiable health information as provided under the HITECH Act.

x) "Fully De-Identified Data" means De-Identified Data that has all identifiers of PARTICIPANT and GHDN Participants (e.g., name of practice, clinic, medical group, hospital or health system) removed, and all identifiers of individual practitioners within PARTICIPANT and GHDN Participant organizations (e.g., name of

3

physician/clinician) removed, and such Fully De-Identified Data is more stringent than the term "De-Identified Data" as defined in the HIPAA regulations.

xi) "Global Healthcare Data Network or GHDN", which leverages CCT's Connected Technologies Platform, means the multi-participant, multi-national, healthcare data network designed, developed and operated by CCT for providing rapid and cost-effective real-world clinical data exploration and analysis of Fully De-Identified Data across multiple healthcare practices, hospitals and health systems through a secure, Federated Query system. The features and general specifications of CCT's GHDN are illustrated in Exhibit 1.

xii) "GHDN Participant" means those participating organizations who provide access via Federated Queries of their Fully De-Identified Data for exploration and analysis, in the aggregate, through the GHDN. All GHDN Participants shall have executed a GHDN Agreement equivalent to this GHDN Agreement in form and substance.

xiii) "GHDN Staging System", which leverages CCT's Connected Technologies Platform, means a standardized package of hardware, software (including without limitation the Software), help desk support, and training to be provided to the PARTICIPANT for the purpose of extracting and consolidating data from the PARTICIPANT'S electronic medical records and other clinical and healthcare information systems, the removal of identifiers to create Limited Data Set Data, De-Identified Data or Fully De-Identified Data, and for patient linking to create longitudinal records. The features and general specifications of the GHDN Staging System are summarized in Exhibit 2.

xiv) "GHDN Staging System Specifications" means the general specifications for the components, services and features to be included in the GHDN Staging System. The GHDN Staging System Specifications shall initially be as set forth in Exhibit 2 to this GHDN Agreement, and may be amended or supplemented from time to time by mutual written agreement of the Parties.

xv) "Guaranteed Annual Minimum Payments" means the guaranteed payments made to PARTICIPANT by CCT pursuant to Section 3 b) i) (iii)

xvi) "Implementation Fee" means a one-time payment to CCT by PARTICIPANT as more fully described in Section 3 d) i).

xvii) "Implementation Work Plan" means a work plan generated by CCT and PARTICIPANT, and mutually agreed to by the Parties within thirty (30) days following the Effective Date, pursuant to Section 5 a) and having the basic elements listed and summarized in Exhibit 4.

xviii) "Licensed Data" shall mean, collectively, the PARTICIPANT Data, PHI PARTICIPANT Data, Limited Data Set Data, De-Identified Data and Fully De-Identified Data that PARTICIPANT licenses to CCT under Section 6.

xix) "Limited Data Set Data" means any PARTICIPANT Data that is not De-Identified Data or Fully De-Identified Data, but that meets the then-current HIPAA standards and tests as information constituting a "limited data set." For example, under current HIPAA regulations, such limited data sets may include indirect identifiers such as dates related to an individual (including dates of admission, service and discharge, dates of birth and death) or certain geographic information pertaining to an

4

individual (five digit zip codes or any other geographic subdivision, such as State, county, town, city, precinct and their equivalent geocodes) and any other information EXCEPT FOR the following direct identifiers of the individual or of relatives, employers, or household members of the individual: (i) name; (ii) postal address information; (iii) telephone numbers; (iv) fax numbers; (v) electronic mail addresses; (vi) social security numbers; (vii) medical record numbers; (viii) health plan beneficiary numbers; (ix) account numbers; (x) certificate/license numbers; (xi) vehicle identifiers and serial numbers, including license plate numbers; (xii) device identifiers and serial numbers; (xiii) web Universal Resource Locators (URLs); (xiv) Internet Protocol (IP) address numbers; (xv) biometric identifiers, including finger and voice prints; and (xvi) full face photographic images and any comparable images or any other identifiers restricted from inclusion in Limited Data Set Data by the HIPAA regulations in force at any point in time.

xx)   "Maintenance Fees" are described in Section 3 d) ii).

xxi)  "Nonpublic Personal Information" or "NPI" "shall mean any information that is not related to health information, but otherwise is personally identifying information, disclosed by PARTICIPANT to CCT or which CCT has or acquires, access, or derives in connection with the Services, that either individually or when combined with other information, could be used to derive information specific to a particular individual, such as that individual's identity, social security number, driver's license number, telephone number, credit or debit card number, address, e-mail address, account information, payroll information, financial information, employee identification number, criminal or employment history, place of birth, mother's maiden name, biometric records, or other factors specific to that individual's physical, mental, economic, financial, or cultural identity. .

xxii)  "PARTICIPANT Data" means one or more (or all of) the following forms: PARTICIPANT Source Data in its original form, PHI PARTICIPANT Data, Nonpublic Personal Information, Limited Data Set Data, De-Identified Data and Fully De-Identified Data.

xxiii) "PARTICIPANT Source Data" means any and all source data provided to CCT by PARTICIPANT from its information systems across the PARTICIPANT organization, including without limitation clinical, administrative, operational and financial data and including any ancillary data that may be available through PARTICIPANT external sources.  The potential sources and types of PARTICIPANT Data being sought are illustrated in Exhibit 1 and Exhibit 2, and summarized in Exhibit 3.

xxiv) "PHI PARTICIPANT Data" means PARTICIPANT Data that comprises Protected Health Information as defined by HIPAA.

xxv)  "Privacy Laws" is defined in Section 10 a)

xxvi) "Protected Health Information or PHI" shall have the meaning given to such term in HIPAA.

xxvii) "Revenue Sharing Pool" is defined in Section 3 b) i).

xxviii)  "Software" means software that is developed, owned or licensed by CCT such as data ingestion and de-identification routines, data model, longitudinal record creation, multi-dimensional data constructs, execution routines, scripts,

credentialed access and user management, user tracking and auditing, federated query routines, analytics and data visualization tools as more fully described in Section 3 b) vi).

xxix) "Source Code" is described in Section 4 c) ii).

xxx) "System Support Services" means those support services that CCT provides to PARTICIPANT regarding the GHDN Staging System and the GHDN as described in Section 5 d).

xxxi) "Term" is defined in Section 9.

xxxii) "Third Party" means any entity other than the Parties to this GHDN Agreement and their affiliates.

xxxiii) "Third Party Software License" means the license of Software by a Third Party, which Software is used by CCT to support the GDHN and will be available for PARTICIPANT to license at the end of the Term, as set forth in Section 4 c) ii).

b) Other Defined Terms. Other capitalized terms used in this GHDN Agreement shall have the meanings ascribed thereto in the body of this GHDN Agreement.

2. **LIST OF EXHIBIITS.** A list of Exhibits affixed hereto and incorporated herein includes the following:

a) Exhibit 1. Features and General Specifications of CCT's Global Healthcare Data Network (GHDN)

b) Exhibit 2. Features and General Specifications of CCT's GHDN Staging System

c) Exhibit 3. Sources and Types of PARTICIPANT Data Being Sought For the GHDN

d) Exhibit 4. Outline of Implementation Work Plan

e) Exhibit 5. Summary of CCT Security Practices

f) Exhibit 6. Form of Business Associate Agreement

3. **GLOBAL HEALTHCARE DATA NETWORK ("GHDN") PARTICIPATION**

a) GHDN Participation. PARTICIPANT agrees to become a participant in CCT's Global Healthcare Data Network, and CCT agrees to support such participation, throughout the Term of this GHDN Agreement.

b) Benefits to PARTICIPANT. As consideration for being a GHDN Participant, PARTICIPANT shall receive the benefits listed in the subsections below.

i) CCT Revenue Sharing from the GHDN. During the Term of this Agreement and any extension thereto, CCT will share, among GHDN Participants, 20.0% of the gross revenue it receives from each CCT Client who subscribes to use the GHDN (the "Revenue Sharing Pool"). Each qualifying GHDN Participant will receive payments from CCT based on a proportionate share of each Revenue Sharing Pool from each such CCT Client, according to the following approach:

(i) 25.0% of the Revenue Sharing Pool from each CCT Client shall be distributed among the corresponding subset of GHDN Participants, based on the relative number of patients (as a percentage) included in the GHDN Participant's fully-de-identified data set in the GHDN at the time of the execution of the subscription agreement by each CCT Client. Such payments will be made to

   each such GHDN Participant within thirty (30) days following CCT's receipt of such CCT Client revenues; and

 (ii) <u>75.0% of the Revenue Sharing Pool</u> from each CCT Client shall be distributed among the corresponding subset of GHDN Participants, based on the relative number of patient records (as a percentage) involved in the cumulative Federated Query results by each CCT Client during its subscription period. These payments will be made to each GHDN Participant within thirty (30) days following the end of each CCT Client's one-year subscription term.

 (iii) <u>Guaranteed Annual Minimum Payments.</u> PARTICIPANT will receive a Guaranteed Annual Minimum Payment of Seventy Thousand Dollars ($70,000) at the end of each year following the Effective Date (except as noted below for year one) over five (5) years during the Initial Term of this Agreement. The first such payment, for contract year one (1) only, will be made to PARTICIPANT upon the mutual agreement on the Implementation Work Plan <u>and</u> the successful loading of PARTICIPANT'S Source Data in accordance with the Implementation Work Plan.

 (iv) <u>Annual Statements.</u> CCT will provide PARTICIPANT with an annual statement regarding all payments it has received from its share of the Revenue Sharing Pool for the preceding contract year pursuant to Sub-Sections 3 b) I) (i) and 3 b) i) (ii) above. The timing of such annual statements shall be based on the anniversary date of this GHDN Agreement. In the event that the sum of such annual payments to PARTICIPANT is less than the Guaranteed Annual Minimum Payment, the difference shall be paid to PARTICIPANT within thirty (30) days following the end of the applicable annual period.

ii) <u>Early Adopter Bonus Revenue Sharing.</u> In addition to the Revenue Sharing Pool set forth above in Section 3 b) I), CCT will share, solely among five (5) Early Adopters, an additional ten percent (10%) of the gross revenues it receives from each CCT Client for subscription to the GHDN (the "Early Adopter Revenue Sharing Pool"). Each Early Adopter will receive an equal share of the Early Adopter Revenue Sharing Pool throughout the Term and any extension thereto. Such payments will be made to each Early Adopter within thirty (30) days following CCT's receipt of such CCT Client revenues, and shall not be included in the calculations involving Guaranteed Annual Minimum Payments.

iii) <u>Additional Revenues from New Opportunities for Sponsored Research.</u> Participation in the GHDN may facilitate new or additional retrospective and prospective sponsored research studies for PARTICIPANT (and through PARTICIPANT, at PARTICIPANT'S sole option), such as those involving PARTICIPANT'S real-world clinical data and the identification of clinical trial candidates (derived through PARTICIPANT with PARTICIPANT'S permission) from GHDN queries and analysis of Fully De-Identified Data by CCT Clients.

iv) <u>Use of a GHDN Staging System.</u> PARTICIPANT shall be provided with either an on-premise or Cloud-based GHDN Staging System which leverages CCT's proprietary Connected Technologies Platform. In both cases, the GHDN Staging System is used behind PARTICIPANT's Firewall for enterprise-level analysis, as well as full

participation in the GHDN, as more fully described below and illustrated in in Exhibit 2.

v) <u>Use of Fully De-Identified Data Licensed by PARTICIPANT and All GHDN Participants.</u> PARTICIPANT shall be provided access to the Fully De-Identified Data it contributes to the GHDN at no cost. There shall also be no fees to query the Fully De-Identified Data licensed and contributed, in the aggregate, by other GHDN Participants.

vi) <u>Other Tools and Services Available to PARTICIPANT.</u> A number of Software and web-enabled tools available to PARTICIPANT may be embedded or integrated in CCT's Connected Technologies Platform, providing the following capabilities:

    (i)    Web interface for user credentialing and setup of routine visualization tasks such as quality and dashboards (SAP Fiori and CCT customized healthcare applications);

    (ii)    Data exploration, visualization and reporting tools (such as SAP Lumira, SAP Business Objects and CCT customized healthcare applications); and

    (iii)    Advanced data analysis and statistical tools (such as R and R-Studio).

In the event that PARTICIPANT wishes to utilize additional analytic or visualization tools or business development services available from CCT or CCT partners, the Parties may negotiate arrangements whereby PARTICIPANT may engage CCT for such additional tools and/or services.

vii) <u>Enhancement of Medical Education, Research and Collaboration.</u> PARTICIPANT's use of the GHDN Staging System and participation in the GHDN will provide new opportunities to bolster its technical and analytics infrastructure supporting medical education and research, as well as to identify and facilitate new opportunities for collaboration with other GHDN Participants at the national and international levels.

viii) <u>New Opportunities for Additional Revenue from Sponsored Research.</u> Participation in the GHDN may facilitate new or additional retrospective and prospective sponsored research studies for PARTICIPANT (through PARTICIPANT, at PARTICIPANT'S sole option), such as those involving PARTICIPANT'S real-world data and the identification of clinical research candidates, derived through PARTICIPANT with PARTICIPANT'S permission, from GHDN queries and analysis of Fully De-Identified Data by CCT Clients.

ix) <u>Early Adopter Participation Agreement Benefits.</u> CCT shall offer PARTICIPANT as an Early Adopter the benefit of any contractual term or set of contract terms (including but not limited to the calculation of the Revenue Sharing Pool), which may be more beneficial to United States Participants than the equivalent term or set of terms hereof, and that is executed by and between CCT and any United States Participant hereafter. If accepted by PARTICIPANT, such term or set of terms shall become part of this Agreement.

x) Post-Term Payments. For sake of clarity, CCT shall pay any payments to PARTICIPANT from the Revenue Sharing Pool or Early Adopter Revenue Sharing Pool calculated based on time periods before the end of the Term, even though the time of payment may be after the Term.

c) Obligations of Both Parties.
   i) Business Associate Agreement. CCT and PARTICIPANT will enter into a standard form of Business Associate Agreement upon execution of a definitive GHDN Participation Agreement as illustrated in Exhibit 6 or as otherwise agreed to by the Parties.
   ii) Implementation Work Plan. The Parties will work together to establish and implementation Work Plan within thirty (30) days after the Effective Date of the Agreement, including the elements outlined in Section 5 a).
d) Obligations of PARTICIPANT.
   i) Implementation Fee. Upon execution of this GHDN Agreement, PARTICIPANT shall pay CCT a one-time Implementation Fee in the amount of Three Hundred and Fifty Thousand Dollars ($ 350,000) to cover the installation, initial setup activities and license to use the GHDN Staging System described in Sections 4 and 5 herein.
   ii) Annual Maintenance Fees. In addition to the Implementation Fee set forth above, PARTICIPANT shall pay CCT an Annual Maintenance Fee in the amount of Thirty Thousand Dollars ($30,000) per year at the beginning of each year during the Term of this GHDN Agreement (except for the first year). Such payments shall be due on each anniversary date of this GHDN Agreement, starting on the first anniversary of the Effective Date. Annual Maintenance Fees are necessary to cover CCT's ongoing expenses for System Support Services such as server and application maintenance, data processing/monitoring and Third Party Software License fees. Upon the establishment of the Implementation Work Plan and the successful loading of PARTICIPANT'S Source Data, CCT shall estimate the ongoing processing requirements and corresponding Software license fees to be paid by CCT associated with PARTICIPANT'S management, processing and analysis of PARTICIPANT Data after the Term as set forth in Section 4 c) ii).
   iii) Cooperate with CCT on Implementation Work Plan. PARTICIPANT will assist CCT, as reasonably requested by CCT in the development of the Implementation Work Plan as more fully described in Section 5 a).
   iv) Assist CCT in the Extraction of PARTICIPANT Data. PARTICIPANT will assist CCT, as reasonably requested by CCT, in the initial extraction, and delivery on an ongoing basis, of PARTICIPANT Data for population of the GHDN Staging System and for use in the GHDN in accordance with the Implementation Work Plan.
   v) Cooperation Regarding Sponsored Research Opportunities. PARTICIPANT shall reasonably cooperate with CCT and CCT Clients, at PARTICIPANT's sole option, regarding potential opportunities for sponsored research relating to retrospective and prospective clinical data analyses and prospective clinical trials that are generated through GHDN queries and analysis by CCT Clients, as described above in Section 3 b) iii). PARTICIPANT shall not be identified to a CCT Client without PARTICIPANT permission.
   vi) GHDN Advisory Board. Serve as a member of the GHDN Advisory Board, as practical, regarding matters related to data governance, analytic methods and priorities, GHDN Participant relationships, publishing opportunities, medical education

9

       opportunities, collaborative relationships among GHDN Participants and CCT Clients and recruitment of additional GHDN Participants.

    vii) <u>Ad Hoc Subject Matter Expertise</u>. Provide subject matter advice, as practical on an ad hoc or planned basis, regarding topics such as clinical/operational/financial analytics objectives, analytic and statistical methodology, research program development and disease/condition focus areas.

e) <u>Obligations of CCT</u>.

    i) <u>Establishment and Management of the GHDN</u>. CCT shall be responsible for the organization, management and operation of the GHDN.

    ii) <u>Provide GHDN Staging System and Access to GHDN</u>. CCT will install and maintain a secure GHDN Staging System for PARTICIPANT's enterprise-level purposes and for secure access and participation in the GHDN as more fully described in Sections 4 a) and 5 a).

    iii) <u>Establish and Manage Security of the GHDN Staging System and GHDN</u>. CCT will be responsible for establishing, monitoring and managing the security of the GHDN Staging System and GHDN, as more fully described in Section 7 and Exhibit 5.

    iv) <u>Sharing CCT Commercial Revenue from GHDN</u>. CCT will share a portion of its revenues received from CCT Client use of the GHDN, as more fully described in Sections 3 b) i) and 3 b) ii).

    v) <u>Facilitate Sponsored Research Opportunities</u>. Upon successful completion of the Implementation Plan, CCT will establish and foster relationships with CCT Clients in order to identify, introduce and facilitate opportunities for PARTICIPANT to enter sponsored research contracts with CCT Clients.

    vi) <u>Support and Training</u>. Upon successful completion of the Implementation Plan, CCT will provide support and training to PARTICIPANT as described in Section 5 d).

    vii) <u>Advisory Board</u>. CCT will organize and manage the activities of a GHDN Advisory Board among PARTICIPANT and all other GHDN Participants involving activities such as data governance, analytic methods and priorities, GHDN Participants relationships, publishing opportunities, collaborative relationships and recruitment of additional GHDN Participants.

    viii) <u>Service Levels</u>. Throughout the term, CCT shall deliver all services at a level that assures PARTICIPANT a high level of service quality, accuracy and access to all system functionality, reasonably consistent with the level of service maintained by leading on-line service providers to the health care industry. Without limiting the foregoing, at no time shall the level of quality, accuracy and access delivered to PARTICIPANT be materially worse than the level of service delivered to any other Participant. CCT shall be excused from these obligations only to the extent the cause for failing to meet service level requirements is due to PARTICIPANT's actions or omissions, or due to circumstances beyond the reasonable control of CCT as set forth in Section 13 b).

    ix) <u>Vendor Risk Assessment</u>. CCT shall, throughout the term, provide all services in compliance with its representations set forth in the Guthrie Clinic IT Vendor Risk Assessment dated July 31, 2018.

4. **GHDN STAGING SYSTEM USE GRANT.**

   a) <u>Provision of GHDN Staging System</u>. Subject to the terms and conditions of this GHDN Agreement, CCT will provide a GHDN Staging System to PARTICIPANT, and CCT hereby grants to PARTICIPANT the right to use the GHDN Staging System as described herein during the Term of this GHDN Agreement, including a fully-paid up license to use all intellectual property associated with the GHDN Staging System design, GHDN design and the Software included in the GHDN Staging System.

   b) <u>Restrictions</u>. PARTICIPANT shall not permit the GHDN Staging System or any part thereof to be used or accessed by any person or entity other than PARTICIPANT and PARTICIPANT'S affiliates' employees, agents, or contractors bound to confidentiality in accordance with Section 11 a) ii). The right to use the GHDN Staging System granted herein is not assignable. PARTICIPANT may use the GHDN Staging System solely to process its own and its affiliates' data and shall not otherwise use the GHDN Staging System to perform data processing functions for any Third Party by acting as a service bureau or processing center, or otherwise. Further PARTICIPANT agrees that it shall not provide access to any Third Party of all or any portion of any health information data that is extracted, formatted or de-identified to any degree, whether in whole or part, with the use of any aspect or component of the GHDN Staging System.

   c) <u>Ownership of GHDN Staging System</u>.

   <u>i) During the Term</u>. During the Term of this GHDN Agreement, CCT has and shall retain the sole and exclusive ownership of all right, title, and interest in and to all components of the GHDN Staging System, including hardware, external communication interfaces, and software (including the Software), along with any additions or modifications thereto and in any and all other design documents, specifications, programming, related written or machine readable materials, and other development work related to the GHDN Staging System, whether or not incorporated into the GHDN Staging System, and in and to all intellectual property rights associated therewith (including, without limitation, any and all copyrights, patents, trademarks, trade secrets, or know-how). PARTICIPANT shall from time to time take any further action and execute and deliver any further instruments, including documents of assignment or acknowledgment that CCT may reasonably request for the purpose of establishing and perfecting its ownership as contemplated in this Section 4 c) i). CCT may attach labels to any GHDN Staging System components giving notice of CCT's ownership thereof, and PARTICIPANT will not permit the same to be obscured or defaced. CCT will have the right to file a copy of this Agreement or any other reasonable form of notice in the proper public records, and to provide copies of the same to Third Parties, to indicate that the GHDN Staging System is and remains the property of CCT.

   <u>ii) Following the Term</u>. CTT hereby grants to PARTICIPANT perpetual, non-exclusive license to the GHDN Staging System Software (other than software used by CCT in the accordance with Third Party Software Licenses),

   At the end of the Term of this GHDN Agreement, except in the event of termination by CCT for uncured breach by PARTICIPANT pursuant to Section 9 c), CCT shall convey ownership of the GHDN Staging System to PARTICIPANT at no cost to PARTICIPANT,

11

unless PARTICIPANT notifies CCT in writing that it does not wish to continue its license past the end of the Term. The Parties shall commence arrangements for PARTICIPANT to continue, at its own expense, the Third Party Software Licenses and Cloud Licenses, as applicable, that had been utilized by CCT. Within sixty (60) days of execution of this Agreement, CCT shall arrange to have the Source Code for the GHDN Staging System provided at commercially reasonable intervals to a reputable domestic US Source Code Escrow Agent, and Participants including PARTICIPANT shall be offered the opportunity at their commercially reasonable cost to obtain the benefit of such services, so that possession of the Source Code may be obtained in the event CCT is unwilling or unable to provide maintenance services as required under this Agreement, including after the Term if PARTICIPANT continues to use the GHDN Staging System.

d) <u>Proprietary Rights</u>. The GHDN Staging System design, GHDN design and the Software, including new releases or product versions provided pursuant to CCT's System Support Services hereunder, are and shall remain (as between the Parties hereto) owned by CCT and are protected by copyright, trademark, trade secrecy, and/or other intellectual property laws. Participant will take all reasonable steps requested by CCT to protect CCT's proprietary rights, which may include, but not limited to, the proper display of proprietary notices on any and all copies thereof. Participant shall not make or permit anyone to make a copy the Software or to make any modifications or derivative works of or based on any portion of the GHDN Staging System, nor will Participant de-compile, disassemble, or otherwise analyze any of the GHDN System design, GHDN System hardware or Software in an attempt to learn or access any source codes, structures or processes thereof.

5. **GHDN STAGING SYSTEM INSTALLATION AND SUPPORT**

a) <u>Installation of GHDN Staging System</u>. Commensurate with the Implementation Work Plan, CCT shall install a GHDN Staging System for PARTICIPANT having the features and general specifications summarized in Exhibit 2, including the physical and technological infrastructure, applications and tools necessary to perform secure electronic extraction of PARTICIPANT Data from PARTICIPANT source systems. CCT will map source data, normalize data, store data in a secure data warehouse and manage data validation, de-identification and longitudinal linkage at all times in compliance with applicable federal and state law and regulations, including, but not limited to the Privacy Laws, as well as the Business Associate Agreement. These activities will be conducted according to the mutually agreeable Implementation Work Plan established by CCT with input from PARTICIPANT within thirty (30) days following the Effective Date. A summary of the components of CCT's standard Implementation Work Plan is included in Exhibit 4. PARTICIPANT will reasonably cooperate with CCT and its personnel in order to schedule and to provide access to PARTICIPANT'S information systems that contain PARTICIPANT Source Data and to facilitate such installation, including without limitation by providing adequate and appropriate facilities, communication services, and temporary work space for CCT personnel while at PARTICIPANT's site.

b) <u>Management of PARTICIPANT Data</u>. All PARTICIPANT Data, including but not limited to PARTICIPANT Source Data, PHI PARTICIPANT Data and PARTICIPANT'S De-Identified Data

12

and Fully De-Identified Data, shall remain in PARTICIPANT'S GHDN Staging System behind PARTICIPANT'S Firewall. Additionally, all PARTICIPANT Data other than Fully De-Identified Data, including PHI PARTICIPANT Data, Limited Data Set Data and De-Identified Data, shall be securely partitioned from the Fully De-Identified Data used for Federated Query through the GHDN, and such PARTICIPANT Data other than Fully De-Identified Data shall be available for access only by CCT and PARTICIPANT. PARTICIPANT acknowledges however, that certain types of Federated Queries and analysis of Fully De-Identified Data may require the use of virtual tables that will have copies of a portion of the Fully De-Identified Data in active RAM memory during the abbreviated period that CCT's GHDN is connected to PARTICIPANT's or GHDN Participant's GHDN Staging Systems when such queries and analyses are being run. No copy of such volatile, in-memory Fully De-Identified Data shall be retained by CCT, PARTICIPANT, other GHDN Participants or CCT Clients after the completion of the Federated Query and analysis session.

c) Additional Components. In the event that any items, components of features of the GHDN Staging System in addition to those outlined in Exhibit 2 are reasonably requested by PARTICIPANT (the "Additional Components"), the Parties shall attempt, in good faith, to mutually agree to such Additional Components, including the timing and associated cost to PARTICIPANT, if any, for the implementation of such Additional Components. The Additional Components shall be listed and described as amendments to Exhibit 2, along with the corresponding fees, as applicable.

d) Training and Support Services for GHDN Staging System and GHDN. CCT's standard support, training and system maintenance services for the GHDN Staging System and the use of the GHDN shall be provided by CCT, when applicable, and shall include the following:

   i) System Support Services will include the following: a) Server Maintenance; b) Application Maintenance; c) Lookup/Master Table Maintenance; d) Pre-Processing of Data; e) Monthly Data Loads; f) Backup; g) Power/Infrastructure; h) Monitoring (e.g. capacity, event log).

   ii) System and Software Training will include training on the access and utilization of the following: a) GHDN Staging System; b) GHDN; c) CCT's customized software; d) SAP's embedded software such as Fiori, Lumira and Business Objects; and e) Access to R and R-Studio.

   These services, which also support the GHDN, are included in the Annual Maintenance Fees set forth in Section 3 d) ii).

e) PARTICIPANT Requirements. PARTICIPANT shall conform in all respects to any and all GHDN Participant policies and procedures of which it receives written notice from CCT. Maintenance and insurance of the GHDN Staging System during the Term of this Agreement, except as described in Section 7 regarding CCT's security practices, shall be the responsibility of PARTICIPANT at its sole expense and shall include, but not be limited to, the provision of appropriate space and utilities for the GHDN Staging System (if on site), internal network connections for the periodic updating of Fully De-Identified Data, and provision and maintenance of the GHDN Staging System's secure network connection to the GHDN. PARTICIPANT agrees that the GHDN Staging System will be

13

insured at PARTICIPANT's expense against theft, loss and damage while on PARTICIPANT's premises, if applicable. Additionally, PARTICIPANT shall reimburse CCT and hold CCT harmless from any such theft, loss and damage of or to the GHDN Staging System. PARTICIPANT shall upon request provide CCT with certificates or other reasonable evidence of such insurance coverage.

6. **LICENSE GRANTS, DATA USE AND SCOPE.**
   a) License Grants.
      i) **License to PARTICIPANT Source Data, PHI PARTICIPANT Data and Limited Data Set Data.** Subject to the terms and conditions of this GHDN Agreement and the Business Associate Agreement, PARTICIPANT hereby grants to CCT, and CCT hereby accepts from PARTICIPANT, the non-exclusive, non-transferable (except as set forth elsewhere herein), fully-paid up right and license to use the PARTICIPANT Source Data, PHI PARTICIPANT Data and PARTICIPANT'S Limited Data Set Data (all part of Licensed Data), during the Term of this GHDN Agreement, solely for the purpose of creating longitudinal De-Identified Data and Fully De-Identified Data, at all times in compliance with the Privacy Laws.
      ii) **License to PARTICIPANT'S De-Identified Data and Fully De-Identified Data.** Subject to the terms and conditions of this GHDN Agreement, PARTICIPANT hereby grants to CCT, and CCT hereby accepts from PARTICIPANT, the non-exclusive, non-transferable (except as set forth elsewhere herein), fully-paid up right and license to use PARTICIPANT'S De-Identified Data and Fully De-Identified Data, during the Term of this GHDN Agreement, for the purposes set forth below in Section 6 b).
   b) Data Use.
      i) **Use by CCT.** Through the PARTICIPANT GHDN Staging System and the GHDN, CCT shall have the right to access and query PARTICIPANT'S De-Identified and Fully De-Identified Data and to conduct analyses of such data on behalf of PARTICIPANT. CCT shall also have the right to access and query PARTICIPANT'S Fully De-Identified Data along with the Fully De-Identified Data of all other GHDN Participants, on behalf of PARTICIPANT other GHDN Participants, CCT Clients, or other Third Parties for the purposes as set forth below in Section 6 c)
      ii) **Use by PARTICIPANT.** Through the GHDN, PARTICIPANT shall have the right to access and query, its PARTICIPANT De-Identified Data and Fully De-Identified Data, and to query the Fully De-Identified Data contributed by all other GHDN Participants, in the aggregate, through the Federated Query system that is provided, controlled and monitored by CCT for the purposes as set forth below in Section 6 c). CCT will also provide applications whereby PARTICIPANT may access and analyze its own PARTICIPANT Data through credentialed access to the GHDN and in conjunction with PARTICIPANT'S internal security, approval and authorization processes.
      iii) **Use by GHDN Participants.** Through the GHDN, GHDN Participants shall have the right to query the Fully De-Identified Data contributed by PARTICIPANT along with all other GHDN Participants, in the aggregate, through the Federated Query system that is provided, controlled and monitored by CCT for the purposes as set forth below in Section 6 c).

iv) Use by CCT Clients. Through the GHDN, CCT Clients shall have the right to query the Fully De-Identified Data contributed by PARTICIPANT along with all GHDN Participants, in the aggregate, through the Federated Query system that is provided, controlled and monitored by CCT for the purposes as set forth below in Section 6 c).

c) Scope of Use by CCT, PARTICIPANT, GHDN Participants, and CCT Clients. The scope of use of the Fully De-Identified Data contributed by PARTICIPANT and other GHDN Participants shall include, but not be limited to, one or more of the following:

    i. Generally assessing patient and provider populations for demographics, distribution of health conditions and potential opportunities for sponsored research and clinical trials;

    ii. Examining patient-related data for epidemiology research, health services research, real-world evidence research, research protocol feasibility, and clinical trial recruitment planning;

    iii. Determining care delivery patterns, product usage patterns, health outcomes, and/or cost of medical care;

    iv. Developing quality improvement models, predictive analytics models and outcomes-/value-based business models;

    v. Evaluating pharmacovigilance, utilization and safety issues; and

    vi. Benchmarking for collaborative learning among GHDN Participants

d) Limitations on Use of PARTICIPANT Data. The PARTICIPANT Data is for use by CCT only as specifically set forth in this GHDN Agreement. CCT shall not, other than as specifically contemplated by this GHDN Agreement, cause or permit others to copy, duplicate, redistribute, retransmit, publish, assign, sell, license or sublicense or otherwise transfer, the Fully De-Identified Data, in whole or in part.

7. **SECURITY POLICIES AND FEATURES OF CCT'S GHDN STAGING SYSTEM AND GHDN.** CCT has established policies and practices for monitoring and managing the security of the GHDN Staging System and GHDN, at all times in compliance with PARTICIPANT's internal standards and policies. CCT protects the data using its layered security methodology, by a combination of the following, as more fully described in Exhibit 5:  a) Secure Local Network and Storage for the GHDN Staging System; b) Secure Business Gateway;  c) Secure Environment Maintenance;  d) AWS Cloud Deployment; e) Federation of Data Queries; f) Credentialed Access, Auditing & Controls; and  g) User Authentication.

8. **MARKETING.**
All materials developed by CCT referencing PARTICIPANT, or by PARTICIPANT referencing CCT, for marketing, distribution, public relations, promotion of the relationship or similar purposes, must first be submitted to the other Party for approval, which approval shall be granted or denied in either Party's sole business discretion.

9. **TERM AND TERMINATION.**

a) Initial Term. The Initial Term of this GHDN Agreement shall remain in full force and effect for a period of five (5) years, commencing on the Effective Date and ending on June 30, 2023, unless renewed by PARTICIPANT as provided in Section 9 b) below or

terminated by either Party as provided in Section 9 c) below or as otherwise provided herein.

b) <u>Renewal Terms</u>.  After the Initial Term, the Term of this GHDN Agreement shall extend automatically for additional terms of one-year (1-year) each (each a "Renewal Term") unless PARTICIPANT provides written notice of non-renewal to CCT no later than the end of the tenth (10th) month of final year of the Initial Term, or of the Renewal Term. The "Term" shall include the Initial Term and the Renewal Term, if applicable.

c) <u>Early Termination</u>.  Either Party may terminate this Agreement due to the breach of any material provision hereof by the other Party; provided that it first gives such other Party written notice of such breach and of the notifying Party's intention to terminate this GHDN Agreement, and affords such other Party the opportunity, over a reasonable period not to exceed sixty (60) days, to cure such breach and thereby to prevent termination under this Section 9 c).

d) <u>Disposition of PARTICIPANT Data, GHDN Staging System and GHDN Access Upon Termination.</u>  Except as provided in the Section 9 d) i) and Section 9 d) ii) below, at the end of the Term of this GHDN Agreement, CCT shall immediately discontinue all access and use of all forms of PARTICIPANT Data; furthermore, within thirty (30) days following such Termination CCT, shall destroy, or eliminate access to, the PARTICIPANT Data and provide verification to PARTICIPANT of such elimination of the PARTICIPANT Data. Except as set forth in Section 4 c) ii), CCT shall also remove, the GHDN Staging System from PARTICIPANT'S installation site (whether it be on-site or in the Cloud), and PARTICIPANT will no longer be provided access to the GHDN, analytic tools or other Software and services conveyed through CCT by this GHDN Agreement.  CCT shall provide PARTICIPANT with a complete copy of all PARTICIPANT Data, including but not limited to its PHI PARTICIPANT Data, Nonpublic Personal Information, De-Identified Data and Fully De-Identified Data, at no cost to PARTICIPANT, in a mutually agreed upon format, provided however, that such termination is not made by CCT pursuant to breach by PARTICIPANT.

   i) <u>Early Termination by CCT in the Event of Breach by PARTICIPANT.</u>  In the event that CCT terminates this GHDN Agreement pursuant to an uncured breach by PARTICIPANT pursuant to Section 9 c) above, CCT shall have the right to make a copy and transfer PARTICIPANT's Fully De-Identified Data and use such PARTICIPANT'S Fully De-Identified Data in a manner consistent with this GHDN Agreement solely to allow for access to such Data by other Participants utilizing the Data for research and other purposes consistent with this GHDN Agreement for a period of five (5) years following such termination by CCT.

   ii) <u>Early Termination by PARTICIPANT in the Event of Breach by CCT.</u>  In the event that PARTICIPANT terminates this GHDN Agreement pursuant to an uncured breach by CCT pursuant to Section 9 c) above or due to insolvency of CCT, PARTICIPANT shall have the rights specified in Section 4 C) ii).

e) <u>Survival</u>.  The following Sections shall survive termination of this Agreement: 1. DEFINITIONS; 9. TERM AND TERMINATION; 10. REGULATORY COMPLIANCE; 11. CONFIDENTIALITY; 12. INSURANCE; and 13. MISCELLANEOUS.

**10. REGULATORY COMPLIANCE.**

    a) <u>Compliance With Law.</u>  Each Party shall, at all times during and throughout the Term of this GHDN Agreement, comply with and abide by all state, federal and international laws or regulations governing privacy, NPI, patient privacy or the use of medical information, including, without limitation, all HIPAA or similar requirements as the same may exist and be applicable at any time (collectively referred to herein as the "Privacy Laws". Each Party's obligations under this Section 10 shall survive expiration and/or termination of this GHDN Agreement. The Parties agree to comply with all applicable laws, rules and regulations, including but not limited to, those laws prohibiting payment for referrals. The Parties agree that it is not a purpose of this Agreement to generate referrals for services or supplies for which payment may be made in whole or in part under any federal healthcare program. Each Party is responsible for compliance with all applicable laws, rules, regulations, or ordinances which may relate to its respective activities and responsibilities under this Agreement. The purpose of the Agreement is to enter into a commercially reasonable and fair market value arrangement. The Parties in good faith believe that this Agreement fully complies with the provisions of 42 U.S.C. 1320a-7b (the Medicare/Medicaid "Anti-Kickback Statute") and the Stark Laws.

    b) <u>Business Associate Agreement.</u>  In the event that any Protected Health Information may be provided by PARTICIPANT to CCT or CCT otherwise obtains access thereto, CCT and PARTICIPANT have executed the Business Associate Agreement attached hereto as Exhibit 6.

**11. CONFIDENTIALITY.**

As used in this GHDN Agreement, "**Confidential Information**" shall mean any information of a Party disclosed by one Party (the "**Disclosing Party**") to another (the "**Receiving Party**") pursuant to this GHDN Agreement that is in written or other tangible form or by oral, visual or other means, which is or reasonably should have been understood by the Receiving Party, because of legends or other markings, the circumstances of the disclosure, or the nature of the information itself to be proprietary and confidential. All data and health information provided by PARTICIPANT, including but not limited to the Fully De-Identified Data are Confidential Information of PARTICIPANT. Each Party recognizes the importance of Confidential Information and each agrees as follows:

    a) The Receiving Party agrees (i) to protect such Confidential Information from disclosure to others, using the same degree of care used to protect its own confidential and proprietary information of like importance, but in any case using no less than a reasonable degree of care, (ii) not to disclose, except as specifically permitted hereunder, any of the Confidential Information or any information derived therefrom to any third person except to its employees, affiliates, agents, and contractors under a confidentiality obligation to the Receiving Party which is no less restrictive than that contained herein, and (iii) not to make any use whatsoever at any time of such Confidential Information except as expressly authorized in this GHDN Agreement.  Any affiliate, employee, agent or contractor given access to any such Confidential Information must have a legitimate "need to know" and shall be similarly bound in writing.  Without granting any right or license, the Parties agree that the foregoing shall

17

not apply with respect to information the Receiving Party can document (i) is in or (through no improper action or inaction by the Receiving Party or any affiliate, agent or employee thereof) enters the public domain, or (ii) was in its possession or known by it prior to receipt from the Disclosing Party, or (iii) was rightfully disclosed to it by another person without restriction, or (iv) was developed independently by it without use of the Confidential Information.

b) Neither Party will disclose any terms or conditions of this GHDN Agreement to any Third Party without the prior written consent of the other Party, except (i) as required by law; (ii) to its attorneys, accountants, and other professional advisors under a duty of confidentiality; or (iii) to a Third Party under a duty of confidentiality in connection with any financing or a proposed merger or a proposed sale of all or part of such Party's business relating to this Agreement.

c) Except as set forth in Section 9 (d)(i) of this GHDN Agreement, immediately upon termination of this GHDN Agreement, the Receiving Party will return or, at the Receiving Party's discretion, destroy and certify the destruction of all Confidential Information and all documents and media containing any such Confidential Information and all copies and extracts thereof (including all Confidential Information in the possession of all end users of the Fully De-Identified Data).

d) Either Party may disclose the other's Confidential Information as required by law, provided such Party notifies the other Party of such requirement and uses reasonable efforts to assist in protecting such confidential information.

e) Each Receiving Party acknowledges and agrees that due to the unique nature of the Confidential Information, there can be no adequate remedy at law for any breach of the obligations hereunder, that any such breach will allow the Receiving Party or Third Parties to unfairly compete with the Disclosing Party and will result in irreparable harm to the Disclosing Party and therefore that upon any such breach or any threat thereof, the Disclosing Party shall be entitled to appropriate equitable relief, including, without limitation, a cease and desist order, temporary restraining order, preliminary and permanent injunctive relief, in addition to whatever remedies it might have at law under this GHDN Agreement.

f) Nothing contained herein shall be construed to prohibit a Party from developing or licensing products, services or information similar to those owned or developed by the other Party so long as such development or licensing is carried out without using Confidential Information disclosed by the other Party. For sake of clarity, the licenses granted herein are non-exclusive, and nothing in this Agreement restricts PARTICIPANT from any use, disclosure or licensing to others of any PARTICIPANT SOURCE Data.

g) Neither Party shall make any press releases, public announcements or other public disclosure regarding this GHDN Agreement, the terms hereof, or the transactions contemplated hereby without the prior written approval of the other Party. Nothing in this paragraph shall preclude CCT and/or Participant from disclosing to potential customers the joint relationship when it is deemed by the Party to increase the marketability of respective products and/or services.

h) To the extent that PARTICIPANT discloses "De-Identified Data" to CCT, CCT shall not, nor attempt to, nor permit, authorize, enable, or request any other party to, associate,

affiliate or link De-Identified Data with any individual or personal information, or make any efforts to reverse engineer or manipulate the De-Identified Data in any way that would expose or enable the identification of an individual. If CCT becomes aware that an attempt, successful or otherwise, was made to re-identify De-Identified Data, CCT shall without unreasonable delay, and in compliance with applicable federal and state law, but in no case later than twenty-four (24) hours after discovery by CCT thereof, notify PARTICIPANT. CCT shall bear all costs related to investigation, assessment and response to such attempt, including any notice required by applicable federal or state law.

i)  NPI Data Breach. In the case of an actual or suspected (i) loss of, (ii) unauthorized acquisition, use or disclosure of, or (iii) unauthorized access to, NPI ("NPI Data Breach"), CCT shall immediately (a) assess and contain such NPI Data Breach, (b) notify PARTICIPANT not later than twenty-four (24) hours after CCT has become aware of such NPI Data Breach, by providing written notice and status updates to PARTICIPANT regarding the investigation at a frequency reasonably requested by PARTICOPANT depending upon the severity of such NPI Data Breach, (c) cooperate with PARTICIPANT'S investigation, (d) take all steps necessary to limit, stop, prevent and remediate such NPI Data Breach, and (e) comply with all PARTICIPANT reasonable requests for information and access to CCT'S or its subcontractors' premises. PARTICIPANT shall have the right to decide whether PARTICIPANT will investigate such NPI Data Breach alone or together with CCT or whether it will lead, or request that CCT lead and report on, the investigation and/or remediation efforts. Without limiting the foregoing, PARTICIPANT will determine whether affected individuals should be notified of such NPI Data Breach.

## 12. INSURANCE.
Throughout the term of this GHDN Agreement, CCT agrees to obtain and maintain insurance coverage described below. CCT acknowledges and agrees that it has, or shall, obtain such coverages within thirty (30) days of the Effective Date of this GHDN Agreement.

a)  Comprehensive General Liability/Product Liability Insurance in the minimum amount of Two Million Dollars ($2,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate.

b)  Network Security and Privacy Liability insurance including Asset Coverage, Network Business Interruption Coverage, Multimedia Liability Coverage, Privacy Notification Costs, Crisis Management Coverage, Cyber Extortion Coverage and Privacy Regulatory Coverage with liability limits of One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate.

## 13. MISCELLANEOUS.

a)  Representatives and Notices. Each Party agrees to designate a qualified person to act as its representative in coordinating the activities of the Parties under this GHDN Agreement and to receive all appropriate notices. All notices and communications hereunder shall be in writing and shall be given by personal deliver or by registered or certified mail unless another form of delivery is mutually agreed upon in writing by the parties. Notice shall be considered received on the date of actual receipt, in the event of personal delivery, or on the date of first attempted delivery, in the event of United

States certified mail or established express delivery service. The representative for each Party may be changed from time-to-time by written notice to the other Party. Said representative shall be as follows:

i) CCT Representative
    Notice Address:    1 N. State Street, Suite 1500, Chicago, IL 60602
    Name:    Wm. Thomas Summerfelt
    Title:    President, North America
    Telephone:    +1-773-597-7081
    Email Address:    tsummerfelt@convergencect.com

ii) Participant Representative:
    Notice Address:    One Guthrie Square, Sayre, PA 18840
    Name:    Joseph Scopelliti MD
    Title:    CEO, The Guthrie Clinic
    Telephone:    1-570-887-3000
    Email Address:    Joseph.Scopelliti@Guthrie.org

b) <u>Force Majeure</u>. Neither Participant nor CCT shall be liable for any delays or failures in performance (other than payment obligation hereunder) due to circumstances beyond its reasonable control. In the event that performance of a Party is delayed under this Section 12 b) for more than sixty (60) days, the other Party shall have a right to terminate this Agreement upon notice to the delayed Party.

c) <u>Trademarks/Publicity</u>. Neither Party to this GHDN Agreement shall use trademarks, service marks, trade names, or other identifying devices of the other Party without the express prior written consent of the other Party. Neither Party shall identify the other either a user or supplier of items or services in any written publicity or marketing materials without the express written consent of the other.

d) <u>Independent Contractor</u>. In connection with this GHDN Agreement, each Party is an independent contractor and as such shall not have any authority to bind or commit the other Party. Nothing herein shall be deemed or construed to create a joint venture, partnership, fiduciary or agency relationship between the parties for any purpose. Each Party acknowledges that it is entering into this Agreement solely on the basis of the agreements and representations contained herein, and for its own purposes and not for the benefit of any Third Party.

e) <u>Revenue Share</u> Audit. CCT shall engage an independent third party to review and audit, on an annual basis, the revenue shares for PARTICIPANT and other GHDN Participants, and provide PARTICIPANT with a report on such review and audit within thirty (30) days of completion of the review and audit.

f) <u>Indemnification</u>. CCT and PARTICIPANT mutually agree to indemnify and hold the other party harmless from and against any and all third party claims, demands, actions, settlements or judgments, including attorney's fees and litigation expenses, based upon

or arising out of the activities described in this Agreement, where such claims, demands, actions, settlements or judgments relate to the negligence, actions or omissions of the other party, its agents, representatives and employees.

g) <u>Choice of Law and Jurisdiction</u>. This Agreement shall be governed by the law of the state in which PARTICIPANT is located, without reference to its conflict of laws rules. CCT and PARTICIPANT agree that all disputes arising out of or relating to this Agreement shall be submitted to the exclusive jurisdiction of the appropriate state or federal court for the county in which PARTICIPANT is located.

**IN WITNESS WHEREOF**, the Parties, intending to be legally bound, have executed this Agreement. The signers represent that they have full authority to execute this GHDN Agreement on behalf of PARTICIPANT and CCT, respectively, and to legally bind each such entity, and that they have read and understand all of the terms and provisions of this GHDN Agreement. This GHDN Agreement is duly executed and effective as of the Effective Date.

**THE GUTHRIE CLINIC**

By: _____

Name: Joseph Scopelliti

Title: CEO - The Guthrie Clinic

Date: 9/5/18

**CONVERGENCE CT, INC.**

By: _____

Name: Wm. Thomas Summerfat

Title: President, North America

Date: 9/7/2018

**EXHIBIT 1**

**Features and General Specifications of CCT's**
**Global Healthcare Data Network (GHDN)**

The GHDN leverages CCT's Connected Technologies Platform, providing a robust data exploration and visualization package with an easy and straight-forward user interface. The Connected Technologies platform empowers users with easy self-service access to data exploration capabilities. It lets qualified users acquire, manipulate and visualize Fully De-Identified Data in a few easy steps using its drag and drop interface, and allows results of queries and analyses and corresponding visualizations to be exported and shared.  Specific capabilities are highlighted in the figure below:



22

**EXHIBIT 2**

**Features and General Specifications of
CCT's GHDN Staging System**

The GHDN Staging System leverages CCT's Connected Technologies Platform which utilizes an agile, flexible, and expandable common data model, applied on-premise or in the cloud, that accommodates many electronic storage formats and types of PARTICIPANT Source Data (illustrated in the figure below). It can be sized in memory and in-memory computing capacity to support the record volume of the patient populations and, if necessary, consolidating multiple disparate healthcare data sources. The GHDN Staging System ingests, fully de-identifies and normalizes patient data to enable enterprise-wide exploration of comprehensive, longitudinal data and to generate analytics and insights that support research related to quality, effectiveness, safety, engagement, population health, real-world evidence, health economics and the demonstration of value. The Connected Technologies Platform, which also powers the GHDN, provides secure and credentialed access, allowing authorized users to explore and analyze data and view results, while maintaining a complete audit trail. The GHDN Staging System is the "gateway" to participation in the GHDN.



23

**EXHIBIT 3**

**Sources and Types of PARTICIPANT Data Being Sought For the GHDN**

CCT is seeking comprehensive clinical, administrative, operational, financial and ancillary data across the PARTICIPANT enterprise and among other parties with whom PARTICIPANT may be integrating care of its patient population and sub-populations.

| SOURCES OF DATA | TYPES OF DATA |
|---|---|
| • Clinic & Practice EMRs<br>• Hospital EMRs<br>• Emergency Department<br>• Operating Room<br>• Practice Management System<br>• Medications/eRx<br>• Pharmacy<br>• Lab<br>• Hospital Registration<br>• Hospital ADT<br>• Physician Ordering Systems<br>• Billing/Financial Systems<br>• Imaging/Radiology<br>• Pathology<br>• Disease Registries<br>• Patient Experience Registries<br>• Population Health/ACO/CIN Databases<br>• 'Omics Databases<br>• BioBank Databases<br>• Other Ancillary Data Sources<br>• Payer Claims Extracts (if available) | • Administrative, billing, financial<br>• Patient Demographics<br>• Patient History<br>• Diagnoses<br>• Office visits, encounters<br>• Clinical procedures<br>• ED visits, procedures<br>• Clinical Orders<br>• Hospital Admissions, Discharge, Transfers<br>• Surgical procedures<br>• Problem lists<br>• Medication History<br>• Rx Ordered/Filled<br>• Lab tests, results<br>• Imaging results<br>• Pathology results<br>• Patient/Provider Attribution<br>• Patient-reported outcomes<br>• Genetics, Genomics and other 'omics<br>• Insurance Coverage/Payer Mix<br>• Payer Claims Data (if available) |

24

**EXHIBIT 4**

**Outline of Implementation Work Plan**

The Implementation Work Plan to be established by CCT and PARTICIPANT involves the planning, identification of resource needs, installation of the GHDN Staging System, assessment-loading-processing of PARTICIPTNT Source Data and the establishment and testing of secure connections to the GHDN Staging System and GHDN. The Implementation process will proceed in thirteen phases over a period estimated to conclude within 3 months:

1. Kickoff Activities involving review of work plan template, PARTICIPANT data/technical environment, review of data extraction processes and CCT Data Model, and identification of PARTICIPANT resources (executive sponsor, project manager, technical lead, security and privacy officers, clinical lead(s), various subject matter experts, and appropriate support staff)
2. Secure Connectivity
3. Systems Inventory
4. Identification and analysis of PARTICIPANT Data Sources
5. Deploy on-premise or Cloud-based hardware
6. Set up GHDN Staging System and install Software
7. Extraction of current year data and retrospective data
8. Data Validation and Normalization
9. Coordination of CCT/PARTICIPANT security models to comply with PARTICIPANT internal standards and policies
10. Identification and activation of authorized users to access the GHDN Staging System and GHDN
11. System Administrator and User training
12. Deploy GHDN Staging System for PARTICIPANT access
13. Deploy PARTICIPANT access to GHDN

25

**EXHIBIT 5**

**Summary of CCT Security Practices**

CCT has established policies and practices for monitoring and managing the security of the GHDN Staging System and GHDN, at all times in compliance with PARTICIPANT's internal standards and policies. CCT protects the data using its layered security methodology, by a combination of the following:

1. CCT protects PARTICIPANT DATA using a layered security methodology having the following attributes:
   a. Secure Local Network and Storage for the GHDN Staging System
      i. The GHDN Staging System server is logically located within PARTICIPANT's intranet, with no open access to the public Internet, whether this server is on premise or located in a private network cloud.
      ii. Only the ports necessary for access to and maintenance of the server are open to connections over the intranet: HTTPS, SSH, and ODBC.
      iii. Data "at rest" on the server is encrypted on storage volumes using the AES-256-CBC algorithm.
      iv. Research data are de-identified using approved HIPAA-compliant methods; resources used for controlled re-identification (at PARTICIPANT's sole option and control) are separately encrypted using the SHA-1 algorighm (in addition to the storage-level encryption) with the key stored internally in the application.
   b. Secure Partition of PHI and other PARTICIPANT DATA. All PARTICIPANT Data other than its Fully De-Identified Data, including PARTICIPANT Source Data, PHI PARTICIPANT Data, Limited Data Set Data and De-Identified Data, will be securely partitioned from the Fully De-Identified Data in the GHDN Staging System with access solely to CCT and PARTICIPANT.
   c. Secure Business Gateway.
      i. All external connections to the GHDN Staging System flow on the Internet across an encrypted Virtual Private Network (VPN) connection or a dedicated private connection from CCT to PARTICIPANT.
      ii. Access to CCT intranet requires a secure VPN connection from remote workstations and, when using AWS Cloud services, between Virtual Private Cloud (VPC) hosting the CCT services and the CCT intranet
   d. Secure Environment Maintenance
      i. Server OS – critical updates installed upon release; anti-virus software installed and updated
      ii. Software – critical updates installed upon release; periodic updates installed semi-annually or as otherwise applicable
      iii. VPN Software – Critical updates installed upon release

26

e.  <u>AWS Cloud Deployment</u> for the GHDN Staging System, if applicable, and for the GHDN on which HIPAA and HITECH certification and compliance has been achieved.

f.  <u>Federation of Data</u> for the GHDN Staging Server and the GHDN by fully leveraging both AWS Cloud and SAP solutions to effectuate and manage Federated Queries

g.  <u>Credentialed Access, Auditing & Controls</u>. Secured and credentialed access allows only qualified users to explore and analyze data and view results at an appropriate level of authorization with a complete audit trail (also used for calculating Revenue Sharing amounts).

h.  <u>User Authentication</u> includes multi-factor authentication (MFA) and multi-device tracking and compatibility.

**EXHIBIT 6**

**FORM OF BUSINESS ASSOCIATE AGREEMENT**

**WHEREAS,** CCT (hereinafter, the "Business Associate") provides services for or on behalf of PARTICIPANT (hereinafter, the "Covered Entity");

**WHEREAS,** it is the mutual intent of the Covered Entity and the Business Associate to enter into this Business Associate Agreement (hereinafter referred to as "Addendum") to enable the Covered Entity to comply with HITECH, the Privacy Standards and the Security Standards (as defined below); and

**NOW, THEREFORE,** in consideration of the agreements, covenants, terms and conditions herein contained and other consideration, the sufficiency of which is hereby acknowledged, the Covered Entity and the Business Associate hereby agree as follows:

I.      **DEFINITIONS FOR USE IN THIS ADDENDUM**

**"Data Aggregation"** shall mean, with respect to Protected Health Information ("PHI" as defined below) created or received by the Business Associate, the combining of such PHI by the Business Associate or with the PHI received by the Business Associate in its capacity as a business associate of another covered entity, to permit data analyses that relate to the health care operations of the respective covered entities.

**"Designated Record Set"** shall mean a group of records maintained by or for the Covered Entity that is (i) the medical records and billing records about individuals maintained by or for the Covered Entity; (ii) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or (iii) used, in whole or in part, by or for the Covered Entity to make decisions about individuals. As used herein the term "Record" means any item, collection, or grouping of information that includes PHI and is maintained, collected, used, or disseminated by or for the Covered Entity.

**"Electronic Media"** shall mean the mode of electronic transmissions. It includes the internet, extranet (using internet technology to link a business with information only accessible to collaborating parties), leased lines, dial-up lines, private networks, and those transmissions that are physically moved from one location to another using magnetic tape, disk, or compact disk media.

**"Electronic Protected Health Information"** or **"EPHI"** shall mean Individually Identifiable Health Information that is (i) transmitted by Electronic Media or (ii) maintained in any medium constituting Electronic Media. For instance, EPHI includes information contained in a patient's electronic medical records and billing records. "EPHI" shall not

28

include (i) education records covered by the Family Educational Right and Privacy Act, as amended, 20 U.S.C. §1232g and (ii) records described in 20 U.S.C.§1232g(a)(4)(B)(iv).

"HITECH" or "HITECH Act" shall mean the Health Information Technology for Economic and Clinical Health Act of the American Recovery and Reinvestment Act of 2009, Public Law 111-005.

"Individually Identifiable Health Information" shall mean information that is a subset of health information, including demographic information collected from an individual, and

(i) is created or received by a health care Participant, health plan, employer, or health care clearinghouse; and

(ii) relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual; and (a) identifies the individual, or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual.

"Privacy Standards" shall mean the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Parts 160 and 164.

"Protected Health Information" or "PHI" shall mean Individually Identifiable Health Information that is (i) transmitted by Electronic Media, (ii) maintained in any medium constituting Electronic Media; or (iii) transmitted or maintained in any other form or medium. For instance, PHI includes information contained in a patient's medical records and billing records. "Protected Health Information" shall not include (i) education records covered by the Family Educational Right and Privacy Act, as amended, 20 U.S.C. §1232g and (ii) records described in 20 U.S.C.§1232g(a)(4)(B)(iv).

"Secretary" shall mean the Secretary of the U.S. Department of Health and Human Services or any office or person within the U.S. Department of Health and Human Services to which/whom the Secretary has delegated his or her authority to administer the Privacy Standards, such as the Director of the Office for Civil Rights, and the Security Standards.

"Security Standards" shall mean Security Standards for the Protection of Electronic Protected Health Information, 45 CFR Part 160 and Part 164, Subpart C.

Capitalized terms used not defined herein shall have the meanings ascribed to them in the Privacy Standards, or the Security Standards.

29

**2.**    **OBLIGATIONS OF THE BUSINESS ASSOCIATE.**

**2.1.**    **Use and Disclosure of Protected Health Information.** The Business Associate shall not use or disclose PHI except as required to satisfy its obligations to the Covered Entity under the GHDN Agreement, as permitted under this Addendum, or as required by law. The Business Associate shall not and shall ensure that its directors, officers, employees, contractors and agents shall not use or disclose PHI received from the Covered Entity in any manner that would constitute a violation of the Privacy Standards or the Security Standards if used by the Covered Entity, except that the Business Associate may use PHI (i) for the Business Associate's proper management and administrative services, (ii) to carry out the legal responsibilities of the Business Associate, or (iii) to provide Data Aggregation services relating to the health care operations of the Covered Entity if required under the GHDN Agreement.    Business Associate may disclose PHI to a third party for Business Associate's proper management and administration, provided that the disclosure is required by law or the Business Associate obtains reasonable assurances from the third party to whom the PHI is to be disclosed that the third party will (a) protect the confidentiality of the PHI; (b) only use or further disclose the PHI as required by law or for the purpose for which the PHI was disclosed to the third party; and (c) notify Covered Entity of any instances of which the third party is aware in which the confidentiality of the PHI has been breached. The Business Associate acknowledges that, as between the Business Associate and the Covered Entity, all PHI shall be and remain the sole property of the Covered Entity, including any and all forms thereof developed by the Business Associate in the course of its fulfillment of its obligations pursuant to the GHDN Agreement.

**2.2.**    **Minimum Necessary.** Business Associate agrees to limit its use, disclosure, and requests of PHI under this Addendum to a limited data set or, if needed by Business Associate, to the minimum necessary PHI to accomplish the intended purpose of such use, disclosure, or request.

**2.3**    **Safeguards Against Misuse of Information.** The Business Associate shall use all appropriate safeguards to prevent the use or disclosure of PHI other than as permitted under this Addendum. The Business Associate shall implement Administrative Safeguards, Physical Safeguards, and Technical Safeguards as outlined within HITECH, Privacy Standards and Security Standards, that reasonably and appropriately protect the Confidentiality, Integrity and Availability of EPHI that Business Associate creates, receives, maintains, or transmits on behalf of Covered Entity

**2.4.**    **Reporting of Improper Uses and Disclosures of Protected Health Information.** The Business Associate shall, without unreasonable delay, but in no event later than within five (5) calendar days after becoming aware of any Security Incident or any use or

30

disclosure of PHI in violation of this Addendum by the Business Associate, its officers, directors, employees, contractors or agents or by a Third Party[MS1], report any such disclosure to the Covered Entity. In such event, the Business Associate shall, in consultation with the Covered Entity, mitigate, to the extent practicable, any harmful effect that is known to the Business Associate of such improper use or disclosure. Business Associate is responsible for any and all costs related to notification of individuals, their legal representatives, or next of kin (if the individual is deceased) of any security or privacy breach reported by Business Associate, as defined in Section 13402 of the HITECH Act (42 USC 17932).

**2.5.**    **Agreements by Third Parties.** The Business Associate shall obtain and maintain an agreement with each agent or subcontractor that has or will have access to PHI, which is received from, or created or received by the Business Associate on behalf of the Covered Entity, pursuant to which agreement such agent or subcontractor agrees to be bound by the same restrictions, terms and conditions that apply to the Business Associate pursuant to this Addendum with respect to such PHI.

**2.6.**    **Access to Information.** Within thirty (30) days after request by the Covered Entity for access to PHI about an individual contained in a Designated Record Set, the Business Associate shall make available to the Covered Entity such PHI for so long as such information is maintained in the Designated Record Set. In the event any individual requests access to PHI directly from the Business Associate, the Business Associate shall within ten (10) days forward such request to the Covered Entity. Any denials of access to the PHI requested shall be the responsibility of the Covered Entity.

**2.7.**    **Availability of Protected Health Information for Amendment.** Within thirty (30) days of receipt of a request from the Covered Entity for the amendment of an individual's PHI or a record regarding an individual contained in a Designated Record Set (for so long as the PHI is maintained in the Designated Record Set), the Business Associate shall provide such information to the Covered Entity for amendment and incorporate any such amendments in the PHI as required by 45 C.F.R. §164.526.

**2.8.**    **Accounting of Disclosures.** Within thirty (30) days of notice by the Covered Entity to the Business Associate that it has received a request for an accounting of disclosures of PHI, other than related to the treatment of the patient, the processing of payments related to such treatment, or the health care operations of a covered entity or its business associate and not relating to disclosures made earlier than six (6) years prior to the date on which the accounting was requested, the Business Associate shall make available to the Covered Entity such information as is in the Business Associate's possession and is required for the Covered Entity to make the accounting required by 45 C.F.R. §164.528. At a minimum, the Business Associate shall provide the Covered Entity with the following information: (i) the date of the disclosure, (ii) the name of the entity or person who received the PHI, and if known, the address of such entity or person, (iii) a brief description of the PHI disclosed, and (iv) a brief statement of the purpose of such

disclosure which includes an explanation of the basis for such disclosure. In the event the request for an accounting is delivered directly to the Business Associate, the Business Associate shall within thirty (30) days forward such request to the Covered Entity. The Business Associate shall implement an appropriate recordkeeping process to enable it to comply with the requirements of this Section.

2.9. **Availability of Books and Records.** The Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI received from, or created or received by the Business Associate on behalf of, the Covered Entity available to the Secretary for purposes of determining the Covered Entity's and the Business Associate's compliance with the Privacy Standards or the Security Standards. This Section 2.8 shall survive the expiration or termination of this Addendum.

2.10. **Indemnification.** The Business Associate shall indemnify and hold the Covered Entity harmless from and against any and all liability and costs, including attorneys' fees, created by a breach of this Addendum by the Business Associate, its agents or subcontractors, without regard to any limitation or exclusion of damages provision otherwise set forth in the Agreement.

2.11. **Notice of Request for Data.** The Business Associate agrees to notify the Covered Entity within ten (10) business days of the Business Associate's receipt of any request or subpoena for PHI. To the extent that the Covered Entity decides to assume responsibility for challenging the validity of such request, the Business Associate shall cooperate fully with the Covered Entity in such challenge.

2.12. **Injunction.** The Business Associate acknowledges and agrees that the Covered Entity will suffer irreparable damage upon the Business Associate's breach of this Addendum and that such damages shall be difficult to quantify. The Business Associate acknowledges and agrees that the Covered Entity may file an action for an injunction to enforce the terms of this Addendum against the Business Associate, in addition to any other remedy the Covered Entity may have.

3.    TERMINATION OF ADDENDUM WITH BUSINESS ASSOCIATE

3.1. **Termination Upon Breach of Provisions Applicable to PHI.** Any other provision of this Addendum notwithstanding, this Addendum may be terminated by the Covered Entity upon five (5) days written notice to the Business Associate in the event that the Business Associate breaches any provision contained in this Addendum and such breach is not cured within such five (5) day period; provided, however, that in the event that termination of this Addendum is not feasible, in the Covered Entity's sole discretion, the Business Associate acknowledges and agrees that the Covered Entity has the right to

32

report the breach to the Secretary, notwithstanding any other provision of this Addendum to the contrary.

**3.2.**  **Return or Destruction of PHI upon Termination.**  Upon termination of this Addendum, the Business Associate shall either return or destroy all PHI received from the Covered Entity or created or received by the Business Associate on behalf of the Covered Entity and which the Business Associate still maintains in any form.  The Business Associate shall not retain any copies of such PHI.  Notwithstanding the foregoing, to the extent that the Covered Entity agrees that it is not feasible to return or destroy such PHI, the terms and provisions of this Addendum shall survive termination of the Agreement and such PHI shall be used or disclosed solely for such purpose or purposes which prevented the return or destruction of such PHI.

**3.3.**  **The Covered Entity's Right of Cure.**  At the expense of the Business Associate, the Covered Entity shall have the right to cure any breach of the Business Associate's obligations under this Addendum.  The Covered Entity shall give the Business Associate notice of its election to cure any such breach and the Business Associate shall cooperate fully in the efforts by the Covered Entity to cure the Business Associate's breach.  All requests for payment for such services of the Covered Entity shall be paid within thirty (30) days.

**4.**  **GENERAL PROVISIONS**

**4.1.**  **Effect.**  The terms and provisions of this Addendum shall supersede any other conflicting or inconsistent terms and provisions in any other agreement between the Covered Entity and the Business Associate, including all exhibits or other attachments thereto and all documents incorporated therein by reference.  Without limitation of the foregoing, any limitation or exclusion of damages provisions shall not be applicable to this Addendum.  All other terms of existing agreements between the Covered Entity and the Business Associate remain unchanged and shall be enforced as written.

**4.2.**  **Amendment.**  The Parties' agree to amend this Addendum to the extent necessary to allow either party to comply with the Privacy Standards, the Standards for Electronic Transactions (45 C.F.R. Parts 160 and 162), HITECH and the Security Standards (collectively, the "Standards") promulgated or to be promulgated by the Secretary or other regulations or statutes.  The Business Associate agrees that it will fully comply with all such Standards and that it will agree to amend this Addendum to incorporate any material required by the Standards.  Such amendment shall be binding upon the Parties at the end of a ten (10) days' prior written notice of amendment to maintain compliance with applicable law or regulations, and shall not require the consent of the Parties.

5. **NOTICES**

<u>Representatives and Notices</u>. All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if delivered or mailed, certified or registered, postage prepaid, or delivered by express courier or receipted hand delivery, (i) if to CCT to:

> CONVERGENCE CT, INC.
>
> 1 N. State Street, Suite 1500
>
> Chicago, IL 60602
>
> Attention:  Wm. Thomas Summerfelt, President North America

or to such other person or place as CCT shall furnish to PROVIDER in writing,

or

 (ii) if to PARTICIPANT, to:

> THE GUTHRIE CLINIC
>
> One Guthrie Square
>
> Sayre, PA 18840
>
> Attention: Joseph Scopelliti MD, CEO

or to such other person or place as PROVIDER shall furnish to CCT in writing.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

**THE GUTHRIE CLINIC**                    **CONVERGENCE CT, INC.**

By: _Ron M_____                    By: _[signature]_

Name: _Roger R. Gatwep_                    Name: _Wm. Thomas Summerfelt_

Title: _Sr Director TAC_                    Title: _President, North America_

Date: _8/31/2018_                    Date: _9/7/2018_

# Exhibit B

# The Guthrie Clinic

## IT Vendor Risk Assessment

Prior to entering into an agreement with an External Party (EP), for example, Business Associates and/or Vendors, where Guthrie confidential or electronic protected health information (ePHI) is involved, the following form to assess the security of information technology systems managed or controlled by the EP will be completed.
This assessment is intended to identify the security and privacy infrastructure of the external party for outsourced or contracted functions.

| Guthrie Sponsor for Business Associate (BA) / Vendor | |
|---|---|
| Guthrie Employee Name | |
| Guthrie Department | |
| Guthrie Department Senior Leader | |
| **Business Associate / Vendor Contact Information** | |
| Company Name | Convergence CT, Inc. (CCT) |
| Full Company Address | 735 Bishop Street, Suite 323, Honolulu, Hawaii 96813 |
| Compliance Officer | Wm. Thomas Summerfelt |
| Compliance Office Phone / Email | 773-597-7081 / tsummerfelt@convergencect.com |
| Technical Contact Name | Donn Mukensnable |
| Technical Contact Phone / Email | 916-798-7338 / dmuk@convergencect.com |
| **Business Relationship** | |
| Is BA a covered Entity? | No |
| If so, please list Privacy Official Name | |
| Privacy Officer Phone / Email | |
| **Business Purpose** | |
| What services will be provided or performed by the Business Associate / Vendor? If software related, please provide name and version of software. | CCT will implement a fully de-identified, research staging system behind Guthrie's firewall within Guthrie's policies and procedures (at the preference of Guthrie, either on premise or in a virtual private cloud). Credentialed access using multifactor authentication provides users access to those fully de-identified data for exploration and analysis. |
| Describe how BA / Vendor will access, use or disclose electronic Protected Health Information (ePHI). | CCT will map source data, normalize data, store data in a secure data warehouse and manage data validation, de-identification and longitudinal linkage at all times in compliance with applicable law and the Privacy Laws. CCT has a proprietary software application that ingests data raw data feeds from sources, strips ePHI from records and replaces ePHI, where appropriate, before loading those data into the fully de-identified staging system. All Guthrie Data, including but not limited to Source Data, PHI Data and De-Identified Data, and Fully De-Identified Data, shall remain in the Staging System behind the Guthrie Firewall. |
| Describe the data elements that will be collected, accessed, used, and/or disclosed and the nature and sensitivity of the data. | Patient demographics, diagnoses, procedures, medications, laboratory orders and results, vitals, treating physician characteristics, financial. Data is not sensitive due to its nature of being fully de-identified. |
| If data is being transmitted to the BA / Vendor, describe the mechanism for transport. | Data are not being transmitted or transported outside of Guthrie's system. |
| Frequency of data transmission? | N/A |
| Will the use, disclosure or transmission of data be sent outside the United States by Guthrie, or the BA / Vendor? | N/A |

| Subcontractors / Third Parties | |
| --- | --- |
| Will BA/Vendor use third party / subcontractors? | No |
| Subcontractor Name(s) / Addresses | N/A |
| Business Function of Subcontractor | N/A |

## Security Impact

| | Where Guthrie Information being Hosted / Maintained | Data At Guthrie | | | BA Hosting / Receiving Data | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Technical Safeguards** | | Yes | No | N/A | Yes | No | N/A |
| 1. | Are unique User IDs assigned for each user account requesting access to systems/applications involving ePHI ? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 2. | Have user access profiles been assigned for access to information involving ePHI based on a job-related role or need-to-know basis? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 3. | Are passwords required for applications involving access to ePHI? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 4. | Is encryption in place for transmittal of ePHI? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 5. | Are audit mechanisms in place to track user(s) access to applications involving ePHI? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 6. | Have network connections with the BA been set up to prevent unauthorized access to ePHI and other sensitive data? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 7. | Is there a mechanism in place to authorize and authenticate system users? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 8. | Is encryption in place for storage of ePHI? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 9. | Are application sessions terminated after a defined period of inactivity? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 10. | If wireless is used in the environment, are there security measures in place to protect ePHI? | ☐ | ☐ | ☑ | ☐ | ☐ | ☑ |
| **Physical Safeguards** | | Yes | No | N/A | Yes | No | N/A |
| 1. | Does organization maintained secure or locked facilities and/or rooms or areas where information resides or is being stored (ie. badge access, keys) to reduce tampering of theft of PHI? (paper or electronic) | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 2. | Does organization provide orientation for access and use of departmental –based information, and ensures employee / users understanding and adherence to security protocol and processes to ensure integrity and confidentiality of electronic and/or paper PHI? | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| 3. | Does organization have procedures in place to control media use (ie. USB's, CD's, etc.) for its computer resources that allows storage of ePHI? | ☑ | ☐ | ☐ | ☐ | ☐ | ☑ |
| 4. | Do you maintain and review access logs and perform background checks on personel who have access to areas where PHI is stored or hosted? | | | | ☑ | ☐ | ☐ |
| 5. | Is access to areas where PHI is hosted or stored restricted based on the role of the employee and access granted only after approval and authorization by facility manager? | | | | ☑ | ☐ | ☐ |
| 6. | Is Guthrie information isolated from other's data the is hosted on your servers/network ? | | | | ☐ | ☐ | ☑ |
| 7. | Is removable media storage encrypted as well as the data at rest on servers? | | | | ☑ | ☐ | ☐ |
| 8. | Does organization allow staff to connect personal computers and devices to the internal network that has Guthrie data on it? | | | | ☐ | ☑ | ☐ |

| Administrative Safeguards | | Yes | No | N/A | Yes | No | N/A |
|---|---|:---:|:---:|:---:|:---:|:---:|:---:|
| 1. | Is access reviewed and granted in authorized manner? | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| 2. | Has BA signed a Confidentiality Agreement or is one included in the contract? | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| 3. | Has BA completed authorized application training prior to being assigned a sign-on code and password? | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| 4. | Does BA have policies and procedures in place to control media re-use and disposal of workstations, laptops and other media that stored or was used to maintain ePHI or confidential information? | | | | ☑ | ☐ | ☐ |
| 5. | Does BA have documented and tested Disaster Recovery procedures to ensure protection of information stored/maintained at the BA site? | | | | ☐ | ☐ | ☑ |
| 6. | Does BA have documented and tested Data Back-up procedures to ensure protection of ePHI stored or maintained at BA site? | | | | ☐ | ☐ | ☑ |
| 7. | Does BA have downtime or continuity plans to address situations when access to involved systems hosting ePHI is not available to meet business needs? | | | | ☑ | ☐ | ☐ |
| 8. | Has BA provided architectural documents (ie. network diagrams) to show where Guthrie data resides and the entry points to the hosted environment, and its relationship to the rest of the entity? | | | | ☑ | ☐ | ☐ |
| 9. | Does BA provide protection against malicious software by staying current with respect to relevant security patches and vulnerability fixes, firmware and operating system software revision levels on their systems? | | | | ☑ | ☐ | ☐ |
| 10. | Does the BA have provides for monitoring the integrity and availability of systems and procedures to respond to alerts of problems? | | | | ☑ | ☐ | ☐ |
| 11. | Does the BA have documented procedures to follow in case the BA or its subcontractors detects a security incident? | | | | ☑ | ☐ | ☐ |
| 12. | Does the BA have procedures for change control for the operating system, application software and associated subsystems that are hosting ePHI or confidential level information? | | | | ☑ | ☐ | ☐ |
| 13. | Does the BA conduct and require employees to complete periodic security awareness training? | | | | ☑ | ☐ | ☐ |
| 14. | Would any information hosted by BA be stored or maintained outside the United States? | | | | ☐ | ☑ | ☐ |
| **Patient Rights** | | | | | Yes | No | N/A |
| 1. | Are there procedures in place to allow an individual to request/review a copy of their own personal information if the information is hosted at the BA site? | | | | ☐ | ☐ | ☑ |
| 2. | Are procedures in place to correct or annotate an individual's personal information if information is hosted at the BA site if requested? | | | | ☐ | ☐ | ☑ |
| 3. | If personal information is corrected by BA, are there procedures in place to notify other holders if this information of the correction? | | | | ☐ | ☐ | ☑ |
| **Retention and Maintenance** | | | | | Yes | No | N/A |
| 1. | Does the BA have a records retention and disposition schedule for records involving PHI? | | | | ☑ | ☐ | ☐ |
| 2. | Does the BA's records retention schedule keep an individual's records for at least one year after an individual's PHI collected by the BA has been used to make a decision that directly affects the individual? | | | | ☐ | ☐ | ☑ |

**Guthrie Attestation–** The information provided above is true and accurate and that there is no falsification, omission, or concealment of material fact.

| Department Director | | Date: |
|---|---|---|
| Privacy /Compliance Officer | | Date: |

**Vendor Attestation –** The information provided above is true and accurate and that there is no falsification, omission, or concealment of material fact.

| Privacy /Compliance Officer | *Wm. Thomas Summerfelt (signature)* | Wm. Thomas Summerfelt | Date: 31July2018 |
|---|---|---|---|

Last updated: 1 /2014

# Buchanan

**Stephanie N. Patton**
717 237 4855
stephanie.patton@bipc.com

409 North Second Street
Suite 500
Harrisburg, PA  17101-1357
T 717 237 4800
F 717 233 0852

July 11, 2023

*VIA UPS*

Dawn Close, Prothonotary
Bradford County Courthouse
301 Main Street
Towanda, PA  18848

Re:    **The Guthrie Clinic v. Convergence CT**

Dear Ms. Close:

Enclosed for filing please find an original and three (3) copies of Plaintiff's Complaint in the above-referenced new action.  A check in the amount of $151.50 for the filing fee is also enclosed.  Kindly timestamp and return a copy of the Complaint in the self-addressed stamped envelope provided.

Please do not hesitate to contact me should you have any questions or if you require any additional information.  Your assistance with this matter is greatly appreciated.

Sincerely,

Stephanie N. Patton/jls

Stephanie N. Patton

SNP/jls
Enclosures

**IN THE COURT OF COMMON PLEAS OF**
**BRADFORD COUNTY, PENNSYLVANIA**

THE GUTHRIE CLINIC,                       )
                                          )     No. 2023-cv-0113
          Plaintiff,                      )
                                          )
     v.                                   )
                                          )     **PROOF OF SERVICE**
CONVERGENCE CT,                           )
                                          )     **(CIVIL ACTION – LAW)**
          Defendant.                      )
                                          )     Filed on Behalf of:
                                          )     The Guthrie Clinic, Plaintiff
                                          )
                                          )     Counsel of Record for
                                          )     this Party:
                                          )
                                          )     Jan L. Budman II, Esquire
                                          )     Pa. I.D. No. 203200
                                          )     Stephanie N. Patton, Esquire
                                          )     Pa. I.D. No. 330201
                                          )
                                          )     BUCHANAN INGERSOLL & ROONEY
                                          )     PC
                                          )     Firm I.D. #038
                                          )
                                          )     409 North Second Street, Suite 500
                                          )     Harrisburg, Pennsylvania 17101
                                          )     Telephone: (717) 237-4800
                                          )     Facsimile: (717) 233-0852
                                          )
                                          )
                                          )     **JURY TRIAL DEMANDED**



2023CV0113-0001   8/15/2023 3:13 PM   # 1511293
PROOF OF SERVICE FILED

Main (Public)

Bradford County Prothonotary

**PROOF OF SERVICE**

I, Jan L. Budman II, Esquire, hereby attest that I caused the following parties at the following locations to be served with a true and correct copy of the Complaint filed in the above-captioned action via Certified U.S. Mail, Return Receipt Requested pursuant to Pa. R. Civ. P. Nos. 403, 404(2), and 424:

      Convergence CT
      C/o Corporation Service Company
      251 Little Falls Drive
      Wilmington, DE 19808

Service was mailed on July 19, 2023, and delivered on July 26, 2023. True and correct copies of the U.S. Postal Service Certified Mail tracking history and return receipt are attached hereto as **Exhibit A.**

Dated: August 14, 2023

      Respectfully submitted,

      BUCHANAN INGERSOLL & ROONEY PC

By: _____
      Jan L. Budman II, Esq.
      Pa. I.D. No. 203200
      Stephanie N. Patton, Esq.
      Pa. I.D. No. 330201
      Buchanan Ingersoll & Rooney PC
      409 North Second Street, Suite 500
      Harrisburg, Pennsylvania 17101
      Telephone: (717) 237-4800
      Facsimile: (717) 233-0852
      jan.budman@bipc.com
      stephanie.patton@bipc.com

      *Attorneys for Plaintiff The Guthrie Clinic .*

1

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Jan L. Budman, II

Signature:

          Jan L. Budman II

Attorney No.: 203200

Dated: August 14, 2023

2

# Exhibit A

Tracking Number:

**70083230000273016778**

⬜ Copy   ⚡ Add to Informed Delivery

**Latest Update**

Your item was delivered to an individual at the address at 11:00 am on July 26, 2023 in WILMINGTON, DE 19808.

---

**Get More Out of USPS Tracking:**

📲 USPS Tracking Plus®

**● Delivered**
**Delivered, Left with Individual**
WILMINGTON, DE 19808
July 26, 2023, 11:00 am

**Out for Delivery**
WILMINGTON, DE 19808
July 21, 2023, 10:10 am

**Arrived at Post Office**
WILMINGTON, DE 19808
July 21, 2023, 9:59 am

**Departed USPS Regional Facility**
WILMINGTON DE DISTRIBUTION CENTER
July 21, 2023, 5:29 am

**Arrived at USPS Regional Facility**
WILMINGTON DE DISTRIBUTION CENTER
July 20, 2023, 2:17 pm

**Arrived at USPS Regional Facility**
HARRISBURG PA DISTRIBUTION CENTER
July 19, 2023, 8:01 pm

**Hide Tracking History**



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

Postage | $
Certified Fee
Return Receipt Fee
(Endorsement Required)
Restricted Delivery Fee
(Endorsement Required)
Total Postage & Fees | $ 11.89

Sent To Convergence CT, Inc., c/o Corp.
Street, Apt. No.; or PO Box No. 251 Little Falls Drive
City, State, ZIP+4 Wilmington, DE 19808

PS Form 3800, August 2006          See Reverse for Instructions

7008 3230 0002 7301 6778

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Convergence CT, Inc.
c/o Corporation Service
Company
251 Little Falls Drive
Wilmington, DE 19808

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  Ryan MacArthur        □ Agent
                         □ Addressee
B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   □ Yes
   If YES, enter delivery address below:        □ No

3. Service Type
   ☑ Certified Mail    □ Express Mail
   □ Registered        □ Return Receipt for Merchandise
   □ Insured Mail      □ C.O.D.

4. Restricted Delivery? (Extra Fee)   □ Yes

2. Article Number
   (Transfer from service label)   7008 3230 0002 7301 6778

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540



UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Stephanie Pollen, Esq.
Buchanan Ingersol & Rooney
409 N Second Street
Suite 500
Harrisburg PA 17101-1357

RECEIVED JUL 2 6 2023

0105959-13

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served upon the following party via U.S. first-class mail:

Convergence CT
C/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

-and at-

Convergence CT
735 Bishop Street, Suite 323
Honolulu, Hawaii 96813

Date: August 14, 2023                    BUCHANAN INGERSOLL & ROONEY PC

By: _____
Jan L. Budman II
*Attorneys for Plaintiff The Guthrie Clinic*

# Buchanan

**Stephanie N. Patton**
717 237 4855
stephanie.patton@bipc.com

409 North Second Street
Suite 500
Harrisburg, PA  17101-1357
T 717 237 4800
F 717 233 0852

August 14, 2023

*VIA UPS*

Dawn Close, Prothonotary
Bradford County Courthouse
301 Main Street
Towanda, PA  18848

Re:    **The Guthrie Clinic v. Convergence CT, No. 2023-cv-0113**

Dear Ms. Close:

Enclosed for filing please find an original and two (2) copies of a Proof of Service in the above-referenced action.  Kindly timestamp and return a copy in the self-addressed stamped envelope provided.

Please do not hesitate to contact me should you have any questions or if you require any additional information.  Your assistance with this matter is greatly appreciated.

Sincerely,

Stephanie N. Patton

SNP/jls
Enclosures

BIPC.com